# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

CAREY HOGG[1]            *

                     *

        Plaintiff,        *

                     *

        v.                 *      Civil Action No.  25- _____

                     *

UNITED STATES DEPARTMENT OF    *      JURY TRIAL DEMANDED
STATE; and MARCO RUBIO,
UNITED STATES SECRETARY OF
STATE

        Defendants.      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

Plaintiff, Carey Hogg, by and through her undersigned counsel, hereby alleges and states as follows:

## PRELIMINARY STATEMENT

1. Plaintiff, Carey Hogg, brings this action against the United States Department of State ("Defendant," "State Department," or "Agency"), for violations of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. §791 (the "Rehabilitation Act"), and relevant provisions of the Americans with Disabilities Act of 1990 ("ADA") as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§12101 to 12213 (collectively, the "ADA"). Specifically, Ms. Hoggs's claims are directed toward disability discrimination: the Agency's failure to reasonably accommodate his disability, retaliation, and disparate treatment.

2. Ms. Hogg was employed as Foreign Affairs Officer, GS-0130-14 at the Network Engagement and Training Team (NET), Policy Plans, and Operations Division (PPO), Global Engagement Center (GEC), Office of the Undersecretary of State for Public Diplomacy and Public

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being filed under seal with the Court in a separate Notice of Filing.

Affairs. She was the longest continuously serving employee, as she had served for the past 10 years. In that time, Ms. Hogg was promoted three times, received two exemplary annual performance ratings, and won awards for her continued excellent performance each year.

3.      In August 2016, Ms. Hogg suffered an on-the-job injury while working in her former GEC office at Navy Hill in Washington, D.C. Ms. Hogg began experiencing sudden and unexplained physical and psychological symptoms, including headaches, sleeplessness, lightheadedness, nosebleeds, and memory loss. This affliction, known as an Anomalous Health Incident (AHI)(but often publicly called Havana Syndrome), has plagued hundreds of American officials stationed abroad in China, Cuba, and elsewhere, including the United States. AHIs cause a unique form of traumatic brain injury or traumatic brain injury (TBI) that physicians have termed an "immaculate concussion," because it leaves no visible impact to the skull. According to a 2020 National Academies of Science, Engineering, and Medicine report commissioned by the Department of State,[2] the diagnosed injuries from this affliction are most likely due to pulsed microwave radio frequency radiation. In response to the AHI crisis in Cuba, the Trump administration withdrew most of its staff members from the embassy in 2017, stating publicly that U.S. diplomats abroad had experienced targeted attacks.

4.      Over the next five years following the onset of these symptoms, Ms. Hogg's condition became unpredictable and began to adversely affect different systems of her body. Nevertheless, she continued to work full-time, bringing her laptop to countless emergency rooms and hospital stays to ensure her continued exemplary job performance. During this time, Ms. Hogg

---

[2] *See* National Academies of Sciences, Engineering, and Medicine, an Assessment of Illness in U.S. Government Employees and their Families at Overseas Embassies. (David A. Relman  and Julie A. Pavlin eds., The National Academies Press, 2020), www.safermr.com/2020/12/national-academy-of-sciences-report-on-html.

was evaluated by countless physicians across the country; tested for an estimated 300 possible conditions; all of which cost over $300,000 in medical costs. Yet, it was also during this period of time that Ms. Hogg received her first promotion at GEC to a GS-13. She had proved she could adapt and thrive as a "go-getter" and leader at the organization. As a result, in January 2020, GEC senior leadership established reasonable accommodations for Ms. Hogg that allowed her to telework "any day, and at any time".

5.      It was not until May 2021 that Ms. Hogg was evaluated at the Mayo Clinic in Minnesota by one of the top neurologists in the United States and was diagnosed with an AHI. Ms. Hogg immediately reported this diagnosis to a supervisor and was instructed to conduct intake sessions with both the Office of Diplomatic Security and State MED. Ms. Hogg requested accommodation for her disability from the State Department's Disability and Reasonable Accommodation Division (DRAD). At this time, Ms. Hogg was promoted to a GS-14 position. Her former supervisor and GEC senior leadership established a Remote Work Agreement (RWA) that allowed Ms. Hogg to continue working full-time while receiving medical care at the Mayo Clinic in Arizona. She continued to receive exemplary annual performance ratings in both the years 2021 and 2022. Ms. Hogg continued to work under the RWA and accommodations with success fostered by the support and confidence from my supervisors and from GEC senior leadership. However, by March 1, 2023, that changed.

6.      On March 1, 2023, Orna Blum and GEC's Resources Division Chief, Daniel Gaush, initiated a re-evaluation of Ms. Hogg's current reasonable accommodations via the DRAD portal, without Ms. Hogg's knowledge, authorization, or consent. Ms. Hogg is informed and believes that her supervisors' had unauthorized access to her medical records via DRAD, which was a violation of Health Insurance Portability and Accountability Act of 1996 (HIPAA).

7.      On March 2, 2023, Ms. Blum informed Ms. Hogg that Ms. Hogg would no longer manage her principal contractor, Kayla Keener, who Ms. Hogg had trained to a promotion as Ms. Hogg's team's Counter Propaganda and Disinformation (CPD) Training Lead.

8.      Ms. Hogg was also specifically advised that she could no longer communicate with Ms. Keener. Without being able to communicate with Ms. Keener, Ms. Hogg was unable to effectively oversee the GEC's CPD training efforts, from development to standardization to implementation – her second key duty in her position. This also stripped Ms. Hogg of her fourth key duty of NET Team Leadership because her contractor, Ed Loo, resigned shortly after. Ms. Hogg's supervisors assigned those duties to her. Furthermore, another contractor, Pat Roemer, the GEC Salesforce Lead, was also let go by Ms. Blum and Mr. Gaush and his duties were assigned to Ms. Hogg. Mr. Roemer was let go after Ms. Hogg briefed her supervisors about the necessity of his duties and responsibilities.

9.      Ms. Hogg's supervisory chain did not establish her performance goals for the year of 2023. Yet, on April 10, 2023, Ms. Blum advised via email "Work Commitment Ideas" which she advised had been developed by way of conversation with Leah Bray. This was the first time that Ms. Hogg had not been involved in the process as it was supposed to be interactive. Ms. Hogg asked Ms. Blum multiple times to meet and discuss these objectives; however each time a meeting was set, Ms. Blum would cancel them at the last minute. This conduct occurred up and until Ms. Hogg filed an informal Equal Employment Opportunity (EEO) complaint.

10.     Ms. Hogg's EEO complaint requested that she be allowed to maintain the reasonable accommodation that she had due to her condition. On May 9, 2023, after she filed the EEO complaint, GEC Deputy Coordinator, Leah Bray, notified Ms. Hogg that at the end of her RWA she would have to return to Washington, D.C. or go on unpaid Family Medical Leave Act

(FMLA) or Leave Without Pay (LWOP). Ms. Bray gave Ms. Hogg this ultimatum knowing that Ms. Hogg was still waiting for status as a Secretarial Designee to receive medical treatment from Walter Reed's National Military Medical Center in Washington, D.C. Ms. Bray's ultimatum essentially required Ms. Hogg to go to Washington, D.C. without any established AHI medical care or go on unpaid leave status.

11.    At the time, Ms. Hogg was working a "flexible work schedule". However, after she filed her EEO complaint her flexible work schedule was no longer approved.

12.    Ms. Hogg's RWA was granted so she could receive critical medical treatment for her AHI condition at the Mayo Clinic in Arizona while she waited for approval of Secretarial Designee status. Her RWA was set to expire on May 31, 2023, and GEC offered to extend it to July 31, 2023, which Ms. Hogg accepted. However, GEC advised her that since she refused to sign or acknowledge the extension of her RWA to July 31, she was no longer on an RWA. This was patently false as Ms. Hogg accepted the offer. In fact, Human Resources required that Ms. Hogg draft the acceptance herself. As part of Ms. Hogg accepting the RWA extension to July 31, she was required to give up her initial accommodation of a flexible work schedule.

13.    With the expiration of her RWA on July 31, 2023, and Ms. Bray refusing to extend it or make any reasonable accommodation for her disability, Ms. Hogg was required to exhaust her annual leave.

14.    Ms. Hogg continued to request reasonable accommodations for her AHI condition and continued to get pushback. In September 2023, GEC management tied a proposed "reassignment" to allow Ms. Hogg to continue to work from home by offering her a "potential detail opportunity" with a different department. The "reassignment" would entirely change Ms.

Hogg's job duties and was perceived as an effort to set her up for failure and give Defendants a feigned reason to fire Ms. Hogg but have it look like it was not due to her AHI disabilities.

15.    Ms. Hogg's FMLA leave ended on January 5, 2024. Her first day back on active-duty status was January 8, 2024. Yet, GEC management treated Ms. Hogg's FMLA as "unauthorized and unscheduled absences from work" and placed her into Absence Without Leave (AWOL) status. On January 8, 2024, Ms. Hogg requested leave as an interim accommodation to facilitate the mandatory interactive process. As an accommodation request, leave as an interim accommodation must be approved by DRAD before Ms. Hogg could submit further leave paperwork. The DRAD approval came on January 24, 2024, to which Ms. Hogg provided the required paperwork to GEC management on January 25, 2024. As such, there was no reasonable reason that GEC management would place Ms. Hogg in AWOL status.

16.    GEC management then advised Ms. Hogg that GEC's operational posture and work demands had returned to pre-COVID norms necessitating her return to in-office work in Washington D.C. GEC management also advised her that a remote work agreement was no longer a viable option because it fell outside the scope of Ms. Hogg's position record, classified settings, and outside the jurisdiction of her official domestic duty station. The entire position that GEC management took was quite false because:

(a)    Ms. Hogg's permanent civil servant position description was not created and drafted until March 2020. It was crafted around what Ms. Hogg was directed to do by GEC management, particularly that her work would remotely start in March 2020 and allowed her to build a new division and lead a team to do the work of a portfolio that she designed. Ms. Hogg has only ever performed her position description work remotely.

(b)     Ms. Hogg's position did not require Top Secret security clearance and did not require any work to be done in a classified setting. In any event, if classified work was required, there were three "Classified Drop" USG offices in the Phoenix area which had agreed to allow Ms. Hogg to use their stations whenever needed. In May of 2023, Ms. Hogg advised GEC management of this and was advised to "cease and desist" her efforts to utilize these three drop areas; citing "lack of funding". Yet, no additional funding was necessary for these three separate working agreements.

(c)     All of Ms. Hogg's position description, duties and responsibilities were able to be performed remotely and were done well. Also, the largest role she had as a team lead was stripped from her once GEC management gutted her team from her. Finally, Ms. Hogg's official domestic duty station was changed from Washington, D.C. to Phoenix in February 2022 due to her AHI medical care located at the Mayo Clinic in Arizona and because Defendants would not provide AHI care and treatment anywhere else.

17.     Defendants have refused to reasonably accommodate Ms. Hogg's disabilities and continue to discriminate and retaliate against Ms. Hogg due to her disabilities. Now, Ms. Hogg seeks intervention from this Court to rectify these harms imposed by Defendants because of her disability.

## JURISDICTION

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, in that this is a civil action arising under the Rehabilitation Act (29 U.S.C. § 791), which is a federal statute that furnishes the causes of action at issue here.

19.     This Court also has jurisdiction over this action pursuant to 42 U.S.C. §2000e-5(f)(3), the jurisdictional provision of Title VII of the Civil Rights Act of 1964, which states that

"[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under" the Act. Section 505(a) of the Rehabilitation Act, 29 U.S.C. §794a(a), cross-references Title VII of the Civil Rights Act and makes clear that "[t]he remedies, procedures, and rights set forth in" 42 U.S.C. § 2000e-16, "including the application of" 42 U.S.C. § 2000e-5(f) through (k), "shall be available" to litigants "with respect to any complaint" brought under the Rehabilitation Act.

<u>**VENUE**</u>

20.    As noted above, the enforcement provisions of Title VII, including 42 U.S.C. §§2000e-5(f) through (k), apply to Rehabilitation Act claims. Pursuant to 42 U.S.C. §2000e-5(f)(3), "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under" the Rehabilitation Act.

21.    Venue is proper in this district under the special venue provision recited in 42 U.S.C. §2000e-5(f)(3), which states that an action "may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought." 42 U.S.C. § 2000e-5(f)(3).

22.     Ms. Hogg's employer, the Office of the Undersecretary of State for Public Diplomacy and Public Affairs of the State Department, maintains its office at 2201 C Street N.W., Washington, D.C. 20520. Ms. Hogg is informed and believes that the GEC management that discriminated and retaliated against her on the basis of her disability were convened at this office, also known as the Harry S. Truman Building. Furthermore, Ms. Hogg is informed and believes the State Department officials who retaliated against her and committed other unlawful employment practices against her were, at all relevant times, stationed in Washington, D.C. Therefore, the unlawful employment practices at issue in this action were committed in  Washington, D.C. Moreover, Ms. Hogg is informed and believe that the employment records relevant to such unlawful employment practices are also maintained and administered at the Harry S. Truman Building offices in Washington, D.C. referenced above.

23.     Pursuant to 42 U.S.C. §2000e-5(f)(3), this action may therefore be brought in any judicial district in Washington, D.C. Venue is particularly appropriate in the United States District Court for the District of Columbia, given that the locations listed above are located in this District.

**PARTIES**

24.     Plaintiff Carey Hogg currently resides in Arizona. She is a citizen of the United States.

25.     Ms. Hogg was employed as Foreign Affair Officer, GS-0130-14 at the Network Engagement and Training Team (NET), Policy Plans, and Operations Division (PPO), Global Engagement Center (GEC), Office of the Undersecretary of State for Public Diplomacy and Public Affairs during the relevant time periods recited in this complaint, for purposes of the Rehabilitation Act. 29 C.F.R. § 1630.2(f). She began her employment with the Agency in or about 2013.

26.     Defendant United States Department of State maintains its principal office at 2201 C Street, N.W., Washington, DC 20520. Defendant Marco Rubio is the current United States Secretary of State and head of the Agency and is named as a Defendant in his official capacity.

<u>FACTS</u>

A.     **Ms. Hogg's Injury and Diagnosis**

27.     In August 2016, Ms. Hogg was working in at the GEC office located at Navy Hill in Washington, D.C. when she was injured. She suffered severe physical pain and psychological issues. An AHI effects people differently but is often, but not necessarily, encompassed by a high frequency sound followed by intense pressure to the head and face followed by pain, nausea and dizziness. Ms. Hogg's symptoms were debilitating enough to interfere with her work.

28.     Over the next five years, Ms. Hogg saw countless doctors who were unable to diagnose her condition. She was tested for an estimated 300 possible medical conditions. In May 2021, Ms. Hogg was evaluated at the Mayo Clinic in Minnesota by one of the top neurologists in the United States, Brent P. Goodman, M.D., wherein she was finally diagnosed with an autonomic nervous system dysfunction that was caused by a qualifying brain injury from an AHI. As a result of this AHI, Ms. Hogg was further diagnosed with other related conditions such as Postural Orthostatic Tachycardia Syndrome (POTS), small fiber neuropathy, chronic migraines, tinnitus, vertigo, chronic idiopathic Mast Cell Activation Syndrome (MCAS), Ehlers Danlos Syndrome (EDS) and TBI-caused bifocal dysfunction and convergence insufficiency which affect her vision. Ms. Hogg receives biweekly treatments at the Mayo Clinic in Arizona for her dysautonomia.

B.     **Ms. Hogg's Disability and Defendants' Adverse Employment Actions**

29.     Ms. Hogg's medical condition effected multiple systems of her body and require that she received care and treatment from many different medical specialists. Each medical

specialist had ordered testing and treatment modalities for Ms. Hogg, which required her to attend an estimated five medical appointments on average per week during the core time of her working hours. This made it difficult for Ms. Hogg to completes the essential functions of her job. However, she remained dedicated to her job and continued to work 40 hours per week with the flexible schedule arrangement she had in place with the Agency since January of 2020.

30.     In May 2021, after Ms. Hogg was formally diagnosed with Havana Syndrome, she immediately reported this diagnosis to a supervisor and was instructed to conduct intake sessions with both DS and State MED. Ms. Hogg requested accommodation for her disability from DRAD. Her former supervisor and GEC senior leadership established a RWA that allowed Ms. Hogg to work full-time while receiving biweekly medical care and treatment at the Mayo Clinic in Arizona.

31.     Ms. Hogg continued to work under the RWA and accommodations with success fostered by the support and confidence from my supervisors and from GEC senior leadership.

32.     On March 1, 2023, without any reason, members of GEC management, Ms. Blum and Mr. Gaush, initiated a re-evaluation of Ms. Hogg's current reasonable accommodations and medical condition via the DRAD portal. This was accessed and done without Ms. Hogg's knowledge, authorization, or consent. There is no known cure for Ms. Hogg's condition and no estimated timeline for the process or knowledge of when or if Ms. Hogg would become asymptomatic or make a full or partial recovery. Plaintiff is informed and believes that her supervisors knew this and made unauthorized access to her medical records to find a way to withdraw certain work accommodations to make it difficult for Ms. Hogg to continue to be successful in her job.

33.     Her supervisors were successful in their attempts. On March 2, 2023, Ms. Blum informed Ms. Hogg that Ms. Hogg would no longer manage her principal contractor, Ms. Keener,

who Ms. Hogg had trained to a promotion as Ms. Hogg's team's CPD Training Lead. This constituted the first adverse employment action that occurred as a result of Ms. Hogg's disability. Ms. Hogg was advised that she could not communicate with Ms. Keener. Without being able to communicate with Ms. Keener, Ms. Hogg was unable to effectively oversee the GEC's CPD training efforts, from development to standardization to implementation. This constituted the second adverse employment action that occurred as a result of Ms. Hogg's disability.

34.    One of Ms. Hogg's contractors, Mr. Loo, resigned shortly thereafter. Ms. Hogg's supervisors assigned Mr. Loo's duties to her instead of allowing Ms. Hogg to hire another contractor. This constituted the third adverse employment action that occurred as a result of Ms. Hogg's disability

35.    Another contractor, Mr. Roemer, the GEC Salesforce Lead, was fired by Ms. Blum and Mr. Gaush and his duties were assigned to Ms. Hogg. Mr. Roemer was fired after Ms. Hogg briefed her supervisors about the necessity of his duties and responsibilities. This constituted the fourth adverse employment action that occurred as a result of Ms. Hogg's disability.

36.    Ms. Hogg's supervisory chain did not establish her performance goals for the year of 2023, although this had been done in each of the previous years. Instead, on April 10, 2023, Ms. Blum sent an email entitled "Work Commitment Ideas" which she advised had been developed by a conversation with another supervisor, Ms. Bray. This was the first time that Ms. Hogg had not been involved in the process as it was supposed to be interactive. This constituted the fifth adverse employment action that occurred as a result of Ms. Hogg's disability.

37.    Ms. Hogg asked Ms. Blum multiple times to meet and discuss these objectives; however each time a meeting was set, Ms. Blum would cancel them at the last minute. This constituted the sixth adverse employment action that occurred as a result of Ms. Hogg's disability.

38.    On May 9, 2023, after she filed her EEO complaint, Ms. Bray notified Ms. Hogg that at the end of her RWA she would have to return to Washington, D.C. or go on unpaid FMLA or LWOP. As her supervisors were aware at this time, Ms. Hogg was receiving intravenous immunoglobulin (IVIG) treatment every two weeks. This made it unable for her to return to Washington, D.C. without being approved and admitted to the Walter Reed Medical Center's treatment program for Havana Syndrome patients. As such, Ms. Bray's required Ms. Hogg to go to Washington, D.C. without any established AHI medical care or go on unpaid leave status. This constituted the seventh adverse employment action that occurred as a result of Ms. Hogg's disability.

39.    During this time, Ms. Hogg was working a flexible work schedule. However, after she filed her EEO complaint her flexible work schedule was no longer approved. This constituted the eighth adverse employment action that occurred as a result of Ms. Hogg's disability.

40.    Ms. Hogg's RWA was set to expire on May 31, 2023, but GEC offered to extend it to July 31, 2023, and Ms. Hogg accepted. However, GEC then advised her that since she refused to sign or acknowledge the extension of her RWA to July 31, she was no longer on an RWA. This was patently false. Ms. Hogg accepted the offer, and, in fact, Human Resources required that Ms. Hogg to draft the acceptance herself. This constituted the ninth adverse employment action that occurred as a result of Ms. Hogg's disability.

41.    Once GEC management finally agreed to her RWA extension to July 31, it was not unconditional. Ms. Hogg was required to give up her initial accommodation of a flexible work schedule. This constituted the tenth adverse employment action that occurred as a result of Ms. Hogg's disability.

42.     Ms. Hogg again requested that her RWA be extended past July 31, 2023, but Ms. Bray refused to extend it. This required Ms. Hogg to exhaust her annual leave. This constituted the eleventh adverse employment action that occurred as a result of Ms. Hogg's disability.

43.     In September 2023, GEC management tied a proposed "reassignment" to allow Ms. Hogg to continue to work from home by offering her a "potential detail opportunity" with a different department. The "reassignment" was changing Ms. Hogg's job duties entirely in an effort to set her up for failure to give Defendants to a feigned reason to fire Ms. Hogg and have it look like it was not due to her disability. This constituted the twelfth adverse employment action that occurred as a result of Ms. Hogg's disability.

44.     Ms. Hogg's FMLA leave ended on January 5, 2024. Her first day back on active-duty status was January 8, 2024. GEC management treated Ms. Hogg's FMLA leave as "unauthorized and unscheduled absences from work" and placed her into AWOL status. This constituted the thirteenth adverse employment action that occurred as a result of Ms. Hogg's disability.

45.     GEC management then advised Ms. Hogg that GEC's operational posture and work demands had returned to pre-COVID norms and necessitated her return to in-office work in Washington, D.C. GEC management further advised Ms. Hogg that a remote work agreement was no longer a viable option for her because it fell outside the scope of her position record, classified settings, as well as outside the jurisdiction of her official domestic duty station. The position that GEC management took was quite false and constituted the fourteenth adverse employment action that occurred as a result of Ms. Hogg's disability because:

(a)     Ms. Hogg's permanent civil servant position description was not created and drafted until March 2020. It was crafted around what Ms. Hogg was directed to do do by GEC

management, particularly that her work would remotely start in March 2020 and allowed her to build a new division and lead a team to do the work of a portfolio that she designed. Ms. Hogg has only ever performed her position description work remotely.

(b)     Ms. Hogg's position did not require Top Secret security clearance and did not require any work to be done in a classified setting. In any event, if classified work was required, there were three "Classified Drop" USG offices in the Phoenix area which had agreed to allow Ms. Hogg to use their stations whenever needed. In May of 2023, Ms. Hogg advised GEC management of this and was advised to "cease and desist" her efforts to utilize these three drop areas; citing "lack of funding". Yet, no additional funding was necessary for these three separate working agreements.

(c)     All of Ms. Hogg's position description, duties and responsibilities were able to be performed remotely and done well. Also, the largest role she had as a team lead was stripped from her once GEC management gutted her team from her. Finally, Ms. Hogg's official domestic duty station was changed from Washington, D.C. to Phoenix in February 2022 due to her AHI medical care located at the Mayo Clinic in Arizona and because Defendants would not  provide AHI care and treatment anywhere else.

C.     **EEOC Complaints**

46.     Ms. Hogg filed an EEOC complaint on April 3, 2023. She elected to use the Agency's Alternative Dispute Resolution Program (ADR) on May 30, 2023. Ms. Hogg's claims were not resolved through the ADR process.

47.     On July 18, 2024, the Agency accepted Ms. Hogg's claims and issued a Report of Investigation (ROI) and notice to Ms. Hogg's then attorney. Ms. Hogg requested a hearing before

an Administrative Judge of the EEOC, and the case was assigned to Judge Sarah McKinin in the Washington Field Office.

48.     Thereafter, rather than pursuing her case in front of the administrative judge for the EEOC, Ms. Hogg decided to exercise her right to file a civil action in this Court. On November 18, 2024, Ms. Hogg, through her legal counsel, advised Judge McKinin and the Agency that Ms. Hogg sought a Right to Sue Notice for purposes of filing a civil lawsuit.

49.     On November 19, 2024, Judge McKinin dismissed the hearing request and remanded the complaint to the Agency for issuance of a Final Agency Decision. A final decision was issued on March 18, 2025.

50.     In accordance with 29 C.F.R. § 1614.407(a) and (b), Ms. Hogg filed this civil action within 90 days of receipt of the final decision on an individual complaint and within 180 days of receipt of the final decision on an individual complaint. As such, Ms. Hogg is "authorized under title VII, the ADEA and the Rehabilitation Act to file a civil action in an appropriate United States District Court" with respect to these claims.

## COUNT ONE

**Failure to Provide Reasonable Accommodation in Violation
of §501 of the Rehabilitation Act
(By Plaintiff against all Defendants)**

51.     Ms. Hogg repeats and realleges paragraphs 27 through 50, as if fully set forth herein.

52.     In May 2021, Ms. Hogg was formally diagnosed with an AHI, an acquired brain injury, a long-term disability characterized by a multitude of diagnosed symptoms, including, *inter alia*, saccadic eye movements, light sensitivity, headaches and lightheadedness, difficulty sleeping, and memory loss, that substantially limit his ability to sleep, work, read, and

concentrate and dizziness. Ms. Hogg's disability therefore meets the definition of a disability under the ADA, which provides the applicable standards for claims under the Rehabilitation Act. *See* 42 U.S.C. §12102. Ms. Hogg's doctors have indicated that while prescribed therapies, medication, and equipment can be used to manage his symptoms, her condition is likely to be permanent.

53.     Prior to this diagnosis, Ms. Hogg could perform the essential functions of her position as a Foreign Affairs Officer, without a reasonable accommodation, as evidenced by her exemplary performance reviews. Once diagnosed with an AHI, Ms. Hogg could likewise perform the essential functions of his position, provided that she receives reasonable accommodations as dictated by DRAD for the years in 2021 and 2022 that would help mitigate her symptoms and allow her to perform the essential functions that she had successfully performed in her position. She continued to receive exemplary annual performance ratings in both the years 2021 and 2022. Her ability to perform the essential functions of her employment with or without reasonable accommodation makes her a "qualified individual with a disability" within the meaning of 42 U.S.C.A. §12111 of the ADA.

54.     However, on March 1, 2023, without any reason, members of GEC management, Ms. Blum and Mr. Gaush, initiated a re-evaluation of Ms. Hogg's current reasonable accommodations and medical condition via the DRAD portal. This was accessed and done without Ms. Hogg's knowledge, authorization, or consent.

55.     On March 2, 2023, and continuing, Ms. Blum, Mr. Gaush and Ms. Bray, as alleged herein above, began to systematically take key components of Ms. Hogg's accommodations away from her. By way of examples, by not extending her RWA past July 31, 2023; by requiring Ms. Hogg to return to in-office work in Washington D.C. without having her

admitted to Walter Reed Medical Center and have some medical care and treatment in place; by no longer approving a flexible work schedule for her; by changing her job duties and responsibilities; and other ways according to further discovery and proof.

56.    It would not have presented an "undue burden" on the Agency to have kept assigned the pre-March 2023 accommodations in place for Ms. Hogg. In fact, given Ms. Hogg's exemplary performance reviews covering more than 10 years of federal service, Ms. Hogg's work would have continued to have been of significant value to the Agency. Instead, Ms. Hogg has been unfairly sidelined due to her disability and the Agency's unlawful discriminatory practices on account of such disability.

57.    Ms. Hogg could continue to work as a Foreign Affairs Officer, GS-0130-14 at the Network Engagement and Training Team (NET), Policy Plans, and Operations Division (PPO), Global Engagement Center (GEC), Office of the Undersecretary of State for Public Diplomacy and Public Affairs with the same team oversight, duties and responsibilities she had been handling which would provide her with the same pay, benefits and opportunities for advancement that she enjoyed prior to and even during her disability status. Ms. Hogg was/is qualified for this position. The Agency failed to meaningfully consider this even after Ms. Hogg filed the EEO Complaint alerting the Agency to its discriminatory actions, which further reflects the Agency's bad faith.

58.    But for the Agency's bad faith, Ms. Hogg would have been reasonably accommodated in her position for which he is qualified and to which she was in. Pursuant to her termination from the Agency, Ms. Hogg has been forced to accept no compensation, no benefits, and no opportunities for career advancement due to the Agency's discriminatory practices. Ms.

Hoggs's duties and responsibilities were changed and now terminated as a result of the Agency's discrimination against Ms. Hogg on account of his disability.

59.      Ms. Hogg suffered damages as a result of the Agency's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the physical and emotional costs of bringing this action.

60.      The Agency intentionally violated Ms. Hogg's rights under the Rehabilitation Act with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT TWO

### Retaliation in Violation of §501 of the Rehabilitation Act
### (By Plaintiff against all Defendants)

61.      Ms. Hogg repeats and realleges paragraphs 27 through 50, as if fully set forth herein.

62.      Ms. Hogg, if accommodated, was well qualified for the Foreign Affairs Officer position she held and that was available, and on which she continued to work until she was fired. Nonetheless, the Agency refused to allow her to continue working in this position, and instead changed her job duties and responsibilities and ultimately fired her.

63.      From on or about the onset of her injury and thereafter, Ms. Hogg engaged in protected activity by complaining to several of her supervisors at the Agency, including Orna Blum, Daniel Gaush, and Leah Bray among others, about the Agency's failure to accommodate Ms. Hogg's medical condition and continue to keep her on an RWA and flexible work schedule in her same position. Ms. Hogg engaged in further protected activity when she requested and received official accommodations from DRAD, and when she filed an EEO complaint pertaining to the Agency's repeated failures.

64.     After Ms. Hogg, informed the Agency that she had been formally diagnosed with an AHI, her job duties and responsibilities changed, she was no longer allowed to manage or speak with certain team members and her goals and objectives were created unilaterally without her input.

65.     After Ms. Hogg filed an EEO complaint, her RWA was not extended past July 31, 2023, she was no longer allowed to keep her flexible work schedule and was required to return to in-office work in Washington D.C.

66.     From that point forward, the Agency moved quickly in its effort to deny Ms. Hogg's reasonable accommodations. Ms. Hogg has suffered damages as a result of the Agency's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the emotional and physical costs of bringing this action.

67.     The Agency intentionally violated Ms. Hogg's rights under the Rehabilitation Act with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT THREE

**Disparate Treatment in Violation of §501 of the Rehabilitation Act**
**(By Plaintiff against all Defendants)**

68.     Ms. Hogg repeats and realleges paragraphs 27 through 50, as if fully set forth herein.

69.     Solely because of Ms. Hogg's disability, the Agency has treated Ms. Hogg differently than it treats similarly situated employees who are not disabled. In addition to refusing to provide a reasonable accommodation to Ms. Hogg, the Agency has also failed to keep Ms. Hogg in her position as a Foreign Affairs Officer despite her exemplary work performance. Plaintiff is informed and believes and there on alleges that other similarly situated but non-

disabled officers have not similarly fired from this position been for which they are qualified and who are not disabled.

70.    Ms. Hogg has also unfairly been treated by being fired solely because of her disability, which has undercut her efforts to advance in her career. This termination should not have occurred. Plaintiff is informed and believes and there on alleges that similarly situated employees with the State Department who are not disabled have not been subject to this type of treatment.

71.    Ms. Hogg suffered damages as a result of the Agency's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the physical and emotional costs of bringing this action.

72.    The Agency intentionally violated Ms. Hogg's rights under the Rehabilitation Act with malice or reckless indifference, and, as a result, is liable for punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests judgment as follows:

A.    Accept jurisdiction over this matter;

B.    Award Plaintiff for her past and future loss of wages and benefits, including back pay and front pay, plus interest;

C.    Award Plaintiff an additional 20 years of credit toward her State Department retirement;

D.    Award Plaintiff financial compensation for emotional distress, pain, and suffering;

E.    Order Defendants to remove from its list of Inadmissible Comments for Employee Evaluation Reports: references to disability status, whether a reasonable

accommodation has been requested or provided due to a disability, the nature/type of any reasonable accommodation requested or provided, and medical information;

F.      Order Defendants to permit employees to reference the same in assignment challenges;

G.      Order Defendants to institute EEO training focusing on disability    discrimination for all DS personnel ranked GS-0130-14 and higher;

H.      Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action; and

I.      Grant Plaintiff such additional or alternative relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all claims so triable.

Date: June 18, 2025

Respectfully Submitted,

s/ *Mark S. Zaid*
_____

| | |
|---|---|
| Mark S. Zaid, Esq. | Evan Selik, Esq. |
| (Serving as Local Counsel) | (*pro hac vice to be filed*) |
| D.C. Bar #440532 | CA Bar # 251039 |
| Mark S. Zaid, P.C. | Christine Zaouk, Esq. |
| 1250 Connecticut Avenue, N.W. | (*pro hac vice to be filed*) |
| Suite 700 | CA Bar #251355 |
| Washington, D.C. 20036 | McCathern LLP |
| (202) 498-0011 | 233 Wilshire Blvd. |
| Mark@MarkZaid.com | Suite 720 |
| | Santa Monica, California 90401 |
| | (213) 225-6150 |
| | eselik@mccathernlaw.com |
| | czaouk@mccathernlaw.com |

Attorneys for Plaintiff