# EXHIBIT A

*U.S. Department of State*
*Office of Civil Rights*
*Washington, DC 20520*

Aaron Szot, Esq.
Kalijarvi, Chuzi, Newman & Finch, P.C.
818 Connecticut Avenue, NW, Suite 1000
Washington, D.C. 20006
aszot@kenlaw.com
**Via e-mail transmittal**

March 18, 2025

**RE: *Carey Hogg v. Marco Rubio***
**EEO Case Number: DOS-0256-23**

Dear Aaron Szot:

Enclosed is the Department of State's Final Agency Decision (Decision) for your client's above-referenced complaint of employment discrimination. The terms "you" and "your" below refer to your client.

**STATEMENT OF APPEAL RIGHTS**

If you do not agree with the findings of the Decision and wish to pursue your client's claim, you may exercise one of the following options:

Option 1: Appeal this Decision to the Equal Employment Opportunity Commission's Office of Federal Operations.

Within thirty (30) calendar days of receipt, you have the right to appeal this Decision to the Office of Federal Operations pursuant to 29 C.F.R. 1614.402(a). **If you do not file an appeal within the prescribed time limits, the appeal will be untimely and shall be dismissed by the Commission.**

The appeal of this Decision must be filed with the following:

Director, Office of Federal Operations
Equal Employment Opportunity Commission

P.O. Box 77960
Washington, D.C. 20013

The appeal may be submitted by one of the following means:

- Hand deliver to:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
One NOMA Station
131 M Street, NE
Suite 5SW12G
Washington, D.C. 20507

- Transmit by Facsimile:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
(202) 663-7022

A ***copy*** of the appeal must also be submitted by email or facsimile to this Office at the same time the appeal is filed with the Commission.

- Transmit By E-mail:

**SOCRComplaintChannel@state.gov**

ATTN: Paige E. Williams
Deputy Director, Office of Civil Rights
U.S. Department of State
2201 C Street, NW
Suite 5806
Washington, D.C. 20520

- Transmit by Facsimile:

Deputy Director, Office of Civil Rights
(202) 647-4969

If you choose to appeal, you should use the EEOC Form 573, Notice of Appeal /Petition (copy enclosed) and should indicate what you are appealing.

Any comments or brief in support of the appeal must be submitted to the Director, Office of Federal Operations, and to the agency within 30 days of filing the appeal. Following receipt of the appeal and any comments or brief in support of the appeal, the Director, Office of Federal Operations, will request the complaint file from the agency. The agency must submit the complaint file and any agency comments or brief in opposition to the appeal to the Director, Office of Federal Operations, within 30 days of receipt of the Commission's request for the Complaint file. A copy of the agency's comments or brief will be served on the Complainant at the same time.

Any appeal must name as party defendant, in his official capacity, Marco Rubio, Secretary of State**. Failure to provide the Department with timely notice of an appeal request may result in having your appeal dismissed before the EEOC.**

Option 2: File a civil action with a United States District Court with jurisdiction over your discrimination complaint.

In accordance with 29 C.F.R. § 1614.407(a), you may elect to file a civil action in an appropriate United States District Court if an appeal has not been filed with the Commission. If you choose to file a civil action, you must name Marco Rubio, Secretary of State, as the proper defendant. Additionally, you must serve the Department of State with appropriate notice that you are initiating a case in federal district court.

A complainant who has filed an individual complaint, an agent who has filed a class complaint or a claimant who has filed a claim for individual relief pursuant to a class complaint is authorized under Title VII of the Civil Rights Act of 1964, *as amended*, to file a civil action in an appropriate United States District Court:

(a) Within 90 days of receipt of the final decision on an individual or class complaint if no appeal has been filed;

(b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and a final decision has not been issued;

(c) Within 90 days of receipt of the Commission's final decision on an appeal; or

(d) After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

The filing of a civil action will terminate further administrative processing of the complaint. If you file a private suit subsequent to filing an appeal, you must notify the EEOC in writing.

Instructions for ensuring proper service of the U.S. Department of State with a summons or complaint are published at 22 C.F.R. § 172.2 and are repeated here for your convenience:

> Only the Executive Office of the Office of the Legal Adviser (L/EX) is authorized to receive and accept summonses or complaints sought to be served upon the Department or Department employees. All such documents should be delivered or addressed to –
>
> U.S. Department of State
> The Executive Office
> Office of the Legal Adviser (L/EX)
> 600 19th Street, NW, Suite 5.608
> Washington, DC 20036
>
> Attention: Alicia Frechette
> Executive Director

**Failure to conduct proper service on the Department of State as described above may result in having your case dismissed based on procedural error.**

If you have further questions or concerns, please feel free to contact me at 202-647-9295 or via email at SollosoE@state.gov.

Sincerely,

Erica Solloso, Chief
Adjudication, Resolution & Compliance (ARC)
Office of Civil Rights

Enclosures:

1. Final Agency Decision
2. EEOC Form No. 573

**UNITED STATES OF AMERICA**
**BEFORE THE UNITED STATES DEPARTMENT OF STATE**

| | | |
|---|---|---|
| **Carey Hogg,** | **)** | |
| **Complainant,** | **)** | |
| | **)** | |
| **v.** | **)** | **EEO Case No. DOS-0256-23** |
| | **)** | |
| **Marco Rubio,** | **)** | |
| **Secretary,** | **)** | |
| **U.S. Department of State,** | **)** | |
| **Agency.** | **)** | |
| | **)** | |

## FINAL AGENCY DECISION

### Decision

Based on the evidence in the record and applicable law, we find that the Agency did not subject Complainant to disparate treatment discrimination, denial of a reasonable accommodation, or hostile work environment harassment based on disability and/or prior protected EEO activity as alleged.

### Statement of the Claims

Complainant alleged that she was discriminated against on the bases of disability (physical and mental) and reprisal (prior protected activity) when:

1. On March 2, 2023, management removed contractor oversight from her job responsibilities;
2. On May 9, 2023, her remote work arrangement – which had previously been granted as an effective reasonable accommodation – expired and no effective accommodation has been implemented since;
3. On July 21, 2023, she received a negative Rater Progress Review Summary;



SBU -PRIVACY OR PII

4. On November 17, 2023, management notified her that her leave in a prior pay period would be marked as AWOL; and
5. She has been subjected to hostile work environment harassment characterized but not limited to the events listed above and:
    a. Having management seek to reevaluate the terms of her approved reasonable accommodation since on or about March 1, 2023; and
    b. Having management fail to establish performance goals for the 2023 performance evaluation period that are consistent with the responsibilities of her position.

## Procedural History

Complainant contacted an EEO Counselor on April 3, 2023. Complainant elected to use the Agency's Alternative Dispute Resolution Program (ADR) on May 30, 2023. Complainant's claim was not resolved through the ADR process. The ADR Program issued to Complainant the "Notice of Right to File" on June 30, 2023. On July 14, 2023, Complainant filed a formal complaint of discrimination, initiating the instant complaint. The U.S. Department of State (the Department, the Agency) accepted the complaint for processing pursuant to 29 C.F.R. § 1614.103, *et seq*. and articulated the claims for investigation as stated above.

The Department conducted an investigation of the accepted claims and issued the Report of Investigation (ROI) and notice of rights to Complainant and her representative on July 18, 2024. Complainant requested a hearing before an Administrative Judge (AJ) of the Equal Employment Opportunity Commission (EEOC), and the case was assigned to Judge Sarah McKinin in the Washington Field Office. On November 19, 2024, Judge McKinin dismissed Complainant's hearing request and remanded the complaint to the Agency for issuance of a Final Agency Decision. This decision on the merits, therefore, is issued in accordance with Judge McKinin's Order and pursuant to 29 C.F.R. § 1614.110(b).

## Statement of Facts

### Complainant's Testimony and Evidence

Complainant was employed as a Foreign Affairs Officer, GS-0130-14 at the Network Engagement and Training Team (NET), Policy Plans, and Operations

Division (PPO), Global Engagement Center, Office of the Undersecretary of State for Public Diplomacy and Public Affairs, working remotely from Fountain Hills, AZ. ROI, pp. 84-85.

Complainant's first-line supervisor from October 1, 2022, through June 9, 2023, was Ms. Oma Blum, Senior Advisor, Global Engagement Center. Complainant's second-line supervisor through June 9, 2023, was Ms. Leah Bray, Chief of Staff, Office of the Deputy Secretary of State. From June 9, 2023, onward, Ms. Bray was Complainant's first-line supervisor and Mr. Daniel Kimmage was her second-line supervisor. ROI, pp. 86, 475, 536-537.

Complainant asserted that the major duties and responsibilities of her position are set forth in her position description and include the oversight she is expected to preside over and serve as the technical authority as subject matter expert for the NET Team, leading the team to establish initial operational capability over three lines of effort, leading the team's influencer network strategy, serving as the GEC's central hub or repository for training curriculum, and acting as the premier resource for best practices within GEC. She related that as of March 2, 2023, she oversaw the work of three contractors – Ms. Kayla Keener, Mr. Ed Loo, and Mr. Patrick Roemer – and that oversight responsibilities had been a part of her work assignments since her position migrated to GEC in 2016. ROI, pp. 98-99.

Complainant noted that on March 2, 2023, Ms. Blum e-mailed her and told her that Ms. Keener, who was Complainant's principal contractor, would report directly to Ms. Blum, which she had not previously discussed with Complainant. She declared that there was a difficulty in that Ms. Blum kept assigning Ms. Keener tasks so that Complainant did not know what Ms. Keener was doing during the day. Complainant contended that she had no problem with Ms. Keener's professional development, but that Ms. Blum had never discussed with her removing Ms. Keener completely from the team and having her take 1/3 of the team portfolio, namely, the training efforts, with her. She related that this change meant that the team's training initiative would no longer be her responsibility. Complainant noted that she tried unsuccessfully to reach Ms. Blum, and that when she spoke to Ms. Keener, she remarked that Ms. Blum had not discussed this with her and indicated that she was concerned about the move. She declared that when she spoke to Ms. Kelli Ketover, Ms. Keener's Contracting Officer Representative (COR), and Mr. Daniel Gaush, the Resources Chief, they

told her that Ms. Blum had discussed this issue with them. Complainant stated that she raised concerns about the stripping of this crucial set of duties from her position description and that since Mr. Loo had resigned, she would have to backfill two of the three positions on her team. She added that this change also violated the reasonable accommodation that had been given to her on January 8, 2020, and would force her to choose between attending her necessary weekly medical appointments and meeting the requirements of her position because she would not have sufficient support. ROI, pp. 99-101.

Complainant alleged that on May 9, 2023, a directive was issued that Complainant could not continue with her flexible work schedule and that when her remote work agreement ended, Complainant would have to report for duty in Washington, D.C. She continued that she was not provided with the documentation she needed for (anomalous head injury) AHI evaluation and potential treatment until July 31, 2023, which was when her remote work agreement ended. Complainant added that on March 5, 2024, her request for a reasonable accommodation to continue to work remotely was formally denied and that on March 20, 2024, she was directed to return to Washington D.C. no later than May 20, 2024. She explained that since it was obvious in 2019 that she was disabled, her management at that time issued a formal Internal Action Memorandum (IAM) and included a variable day schedule in which Complainant would telework when she needed to and work any day and any hours that would total 80 hours in a pay period. Complainant related that the IAM was approved on January 8, 2020, and that afterwards, her salary was adjusted to match the lower locality pay in Arizona, and Complainant was given several remote work agreements (RWA) from April 2021 through May 31, 2023. ROI, pp. 103-105.

Complainant related that on March 1, 2023, Ms. Blum and Mr. Gaush started a reevaluation of her reasonable accommodation and asked her to obtain updated medical documentation. She claimed that they mislead Mr. Brown and started this process without even contacting Complainant. Complainant related that she contacted the head of the Disability and Reasonable Accommodation Division (DRAD) concerning Ms. Blum's and Mr. Gaush's inaccurate statements and their breach of her confidentiality, and that Mr. Brown was assigned to her case. She related in detail the communications she and her attorney had with Mr. Brown as set forth below. Complainant emphasized that she was not requesting a new reasonable accommodation but merely the continuation of the reasonable

accommodations she has been working under for several years, that her accommodations were not merely workplace flexibilities, that Complainant should not have to request a reasonable accommodation on a recurring basis, and that the question of Ms. Keener's role needed to be clarified. She indicated that the confusion was still being resolved when Ms. Bray issued her May 9, 2023, directives. ROI, pp. 105-108.

Complainant asserted that on May 9, 2023, Ms. Bray informed Complainant that she would no longer be permitted to have a flexible work schedule or to work remotely and that she was required to return to Washington, D.C. on July 31, 2023. She contended that she had brief interaction with Mr. Brown after May 9, 2023, and that on July 6, 2023, DRAD issued their decision regarding Complainant's hours and schedule, which was too restrictive, so Complainant went into inactive duty status. Complainant declared that she is able to meet the essential functions of her position with reasonable accommodations, which she has had in place for several years, and that there is no alternative accommodation that she needs other than working from Arizona and a flexible work schedule. She claimed that there are no job functions that she cannot perform in Arizona. She indicated that management has unreasonably delayed action on her 2023 accommodation requests until Ms. Bray's May 9, 2023, letter, and that her reasonable accommodation request was not formally denied until March 2024. Complainant note that as of March 20, 2024, she was ordered to return to D.C. no later than May 20, 2024, even though management was allegedly looking for an alternate position as an accommodation. ROI, pp. 108-111.

Complainant stated that she should be allowed to continue working from Arizona as it is an effective reasonable accommodation which enables her to perform the essential functions of her position within her medical restrictions and need for regular medical treatment. She contended that her accommodations do not constitute an undue hardship, especially as her injuries were incurred in the line of duty and that she has had glowing performance evaluations while working under these accommodations. Complainant declared that she was placed on LWOP as an interim accommodation while DRAD considered her reasonable accommodation request and that on March 5, 2024, she received the letter from DRAD denying her request. She maintained that she requested DRAD reconsider the denial while she was informed by management that she had to return to duty in D.C. not later than May 20, 2024, which may have short-circuited the process

to search for a job to which Complainant could be reassigned within her medical restrictions. Complainant claimed that these actions also constituted harassment based on her medical condition and protected activity. ROI, pp. 111-114, 125-126.

Complainant continued that on July 21, 2023, Ms. Bray initiated a mid-year review to evaluate Complainant's performance against her goals in her position description. She described how such a review is supposed to occur and claimed that Ms. Bray did not give Complainant an opportunity to discuss her review prior to entering it into the system. Complainant described how she was frustrated by management in February through July 2023, including Ms. Blum's refusal to backfill two contractor vacancies on Complainant's team, Ms. Blum's and Ms. Bray's repeated refusal to discuss Complainant's performance goals, Ms. Bray's removal of Complainant's remote work agreement and flexible schedule, Ms. Blum's addition of significant administrative work, and Ms. Blum's untimely transmittal of Complainant's performance goals, which were also incorrect. She indicated that the performance review contained numerous erroneous statements, including: 1) difficulty getting Complainant to follow simple instructions; 2) increased classified work which Complainant could not perform remotely; 3) inability of Complainant to focus on meeting suspense dates; and 4) difficulties regarding training programs. Complainant objected to these statements, finding the first one to be offensive and inaccurate, the second to be irrelevant because dealing with classified information is not a part of her position description, the third because she was tasked with many additional duties and responsibilities with severe deadlines, and the fourth because Ms. Blum had taken over training responsibilities when she assumed authority over Ms. Keener. ROI, pp. 115-119.

Complainant added that she was not provided any input into her untimely performance goals, that her position description had not been entered into the system, that she was on leave when the review was conducted, that new goals were established which required Complainant to have access to classified information, and that the overall review was replete with erroneous, inaccurate, and incorrect statements and inferences. She noted that her previous evaluations had always been exceed expectations or outstanding. Complainant claimed that these actions also constituted harassment based on her medical condition and protected activity. ROI, pp. 120-123, 127-128.

Complainant claimed that because Ms. Blum and Ms. Bray ended her flexible work schedule, she had been unable to gauge her leave balances and accordingly, does not know if there is any basis for her being charged AWOL for not having leave available to cover her absence from work. She declared that Ms. Blum unilaterally made Complainant use a flex schedule timesheet to record her time, although there had been no difficulties recording her time in the previous years she had been under a flexible schedule. Complainant explained that the timekeeping issues escalated after Ms. Bray ordered Complainant to return to D.C. and gave her a new timesheet on June 22, 2023. She contended that use of the new timesheet was very confusing, that it was frequently edited, and that compliance with it took up great amounts of Complainant's time. Complainant related that she gave her estimated leave usage to management on August 23, 2023, taking various forms of leave and comp time and that based on her calculations, she would go into unpaid FMLA leave on September 18, 2023. She indicated that she was told on September 8 and 15, 2023, that her leave balances were low, and on September 25, 2023, was told that she was at that point in an AWOL status. Complainant maintained that while Ms. Bray approved her FMLA dates, she subsequently refused to approve the conversion of her AWOL charges to LWOP without responding to Complainant. She asserted that she should not have been charged AWOL because she was already in an inactive duty status as of August 1, 2023, she had explained to management on August 23, 2023, that retroactive changes to her time would create problems and that they needed to avoid this occurring, and that she had submitted her FMLA paperwork so there was no assumption that Complainant was in an active-duty status. ROI, pp. 135-140.

Complainant's position description specifically does not designate her as a supervisor. The duties listed therein pertain to Complainant's leadership of actions and guidance, not supervision of individuals. ROI, pp. 144-146.

In all of her performance appraisals from 2013-2022, Complainant received exceeds expectations for most of her critical performance elements, and was rated exceeds expectations or outstanding on her overall rating, as well as receiving several awards. ROI, pp. 239-252, 260-336.

Ms. Blum contacted the DRAD regarding Complainant's remote work agreement because Complainant requested it. Ms. Blum states that DRAD informed her that such an agreement is not approved by DRAD as a reasonable accommodation. ROI, pp. 149-150.

On March 2, 2023, Ms. Blum notified Complainant that she would be taking over direction of Ms. Keener from Complainant while keeping Complainant in the loop on what Ms. Keener was doing. On March 3, 2023, Complainant notified Ms. Blum that Mr. Loo would be leaving and objected to Ms. Blum taking over supervision of Ms. Keener. ROI, p. 339-341.

Throughout March 2023, Complainant and Mr. Brown exchanged correspondence regarding Complainant's proposed reasonable accommodation of a remote work agreement (RWA), a flexible work schedule, and a personal service contractor. ROI, pp. 350-361.

On April 10, 2023, Ms. Blum told Complainant that she and Ms. Bray had reviewed Complainant's work commitments, gave Complainant a copy of their work, and told Complainant that her feedback was welcome. ROI, pp. 189-190.

On May 9, 2023, Ms. Bray reached out to Complainant and extended her RWA to July 31, 2023, to give Complainant additional time to coordinate her return to D.C. She also gave Complainant the options of a detail to a different bureau to retain her RWA or taking leave if Complainant could not return to D.C. by the required date. ROI, pp. 365-366.

On May 18, 2023, Complainant contacted Ms. Bray and gave her extensive information about Complainant's work schedule. Ms. Bray responded to Complainant's information and emphasized that the agreement that had been approved by her previous supervisor was not a reasonable accommodation, that Complainant did not have a currently approved reasonable accommodation through DRAD, and that Complainant would need to return to Washington, D.C. ROI, pp. 157-161.

On July 5, 2023, Mr. Brown proposed a new flexible schedule for Complainant with accommodations for Complainant's treatments on Thursday and Friday, which Complainant approved. ROI, 162-163.

On July 20, 2023, Ms. Bray provided a progress review summary indicating that Complainant needed to improve in meeting deadlines, complete overdue projects, and improve coordination of planned work assignments to ensure alignment with GEC's evolving strategies. ROI, p. 181.

On July 26, 2023, the Under Secretary of Defense approved Complainant to have her status assessed as a "Secretarial Designee", thus authorizing Complainant to have her care provided at no cost by a qualified military medical treatment facility and specifically, Walter Reed National Intrepid Center of Excellence, (member of the Intrepid Network for Traumatic Brain Injury and Brain Health). ROI, pp. 367-369.

On August 23, 2023, Complainant indicated to management that she would be moving shortly into unpaid FMLA leave and gave what she estimated as her remaining paid leave balance. ROI, pp. 196-197.

Between August 9, 2023 and November 25, 2023, colleagues repeatedly contacted Complainant to remind her to submit proper documentation to avoid lapsing into absent without leave status (AWOL).

On November 7, 2023, Complainant noted to Ms. Bray that she had less paid leave time than she had originally estimated and was therefore placed in AWOL status for a period of time. Complainant asked for the AWOL to be changed to LWOP, and on November 17, 2023, Ms. Bray asked Complainant for further clarifications of the context for Complainant's request. ROI, pp. 198-200.

On November 28, 2023, and December 11, 2023, Complainant provided Ms. Bray with additional information about her request for the conversion of her AWOL charges to LWOP. ROI, pp. 201-213.

After considerable discussion, on January 24, 2024, DRAD approved Complainant's request for LWOP as an interim accommodation while her request for remote work as a reasonable accommodation was being reviewed. ROI, pp. 164-173.

On March 5, 2024, DRAD denied Complainant's reasonable accommodation request, finding it to be an undue hardship and requiring the removal of essential functions of her position. It added that a proposed alternative accommodation was offered and rejected. ROI, pp. 370-372.

On March 5, 2024, Complainant was notified of DRAD's decision denying Complainant's request for telework as a reasonable accommodation. Complainant requested reconsideration of that decision on March 19, 2024. ROI, pp. 174-180.

On March 19, 2024, Complainant was ordered to report for duty no later than May 20, 2024. ROI, pp. 373-376.

Management's Testimony and Evidence

RMO 1 Orna Blum, Senior Advisor

Ms. Blum testified that on March 2, 2023, she informed Complainant of changes to her portfolio based on a decision by Ms. Ketover, the Contracting Officer's Representative (COR), and that Ms. Keener would now report to Ms. Blum. She noted that she had a subsequent telephone conversation with Complainant which she memorialized in an e-mail of the same date. Ms. Blum stated that Complainant's position description does not give her oversight responsibilities for a specific contractor, but rather overall direction and guidance. She indicated that Ms. Ketover expressed concerns about the timing, content and mixed messages Complainant sent to the contractors. Ms. Blum continued that Ms. Keener was engaged in work that required classified meetings and information, and that when Complainant raised concerns about her position's classification and the office's priorities, she assured Complainant that the contractors who remained on the team would continue to report to her and that her position description and grade had not changed. She contended that Ms. Keener would be more effectively overseen by Ms. Blum due to the classified nature of her assignments, and that Complainant could make recommendations to Ms. Blum about assignments for Ms. Keener and Ms. Blum would decide whether to assign them to Ms. Keener. ROI, pp. 478-481.

Ms. Blum declared that Complainant's duty station has always been Washington, D.C. and that as the office was returning to in-person operations post-pandemic, Complainant needed to return to D.C. to have the necessary access to classified information which she could not access under the RWA. She maintained that the agreement was not extended so that Complainant could return to D.C. and affirmed that the agreement was not established as a reasonable accommodation. Ms. Blum noted that Complainant expressed her intent to return to D.C. and to look for housing prior to her return, but that she never followed through on that intent. She explained that in order to request a reasonable accommodation an employee must contact DRAD, and that she referred Complainant to that office when she expressed interest in making such a request. Ms. Blum referred all questions regarding the adjudication of Complainant's reasonable accommodation request to DRAD. ROI, pp. 481-487.

Ms. Blum stated that she left the office in June 2023 and was not Complainant's rater for the progress review summary in July 2023, or otherwise involved in the summary. She added that she had nothing to do with the November 17, 2023, AWOL charge as she had left the office by that time. Ms. Blum denied reevaluating Complainant's reasonable accommodation as the Complainant did not have an official reasonable accommodation. ROI, pp. 487-493.

Throughout March and April 2023, Ms. Blum worked with Complainant to shape Complainant's work commitments. ROI, pp. 512-515.

On March 1, 2023, Mr. Brown informed Ms. Blum that DRAD did not at that time approve remote work agreements, which are promulgated by bureau management, and Division Chief. Gaush affirmed on March 3, 2023, that Complainant's remote work agreement was not administered through DRAD. ROI, pp. 515-517.

<u>RMO 2 Leah Bray, Chief of Staff</u>

Chief of Staff Bray claimed that in early 2023, Ms. Ketover received complaints from the contracting company regarding the toxic work environment Complainant was creating for contract employees. She continued that management made the decision to remove Ms. Keener from Complainant's oversight. Ms. Bray clarified that Complainant is not in a supervisory position and

does not have supervisory authority over personnel. She indicated that the leadership component of Complainant's position description deals with providing direction and guidance, not supervising. Ms. Bray related that while she was informed about the change in Ms. Keener's supervision, she had no role in that decision. ROI, pp. 540-543.

Ms. Bray contended that the remote work agreement was not a reasonable accommodation approved by DRAD, but rather a one-year agreement authorized by GEC, and which was not renewed because Complainant was not able to perform her necessary job duties in a remote status. She noted that when Complainant requested a remote work agreement (RWA) in the spring of 2023 as a reasonable accommodation, DRAD informed her that a RWA was not a reasonable accommodation offered by the Agency. Ms. Bray testified that on May 9, 2023, she notified Complainant that the RWA would not be renewed because of the office's current focus areas and the need for Complainant to be involved in matters that often deal with classified materials. She added that she told Complainant that they could extend the agreement for two additional months, to July 31, 2023, to give Complainant time to make arrangements to return to D.C. Ms. Bray explained that Complainant is not able to fulfill the requirements set forth in her position description without accessing the various classified materials and conversations. ROI, pp. 543-544, 558-560.

Ms. Bray claimed that since Complainant could not perform her work remotely, Ms. Bray worked with the Bureau of Education and Cultural Affairs (ECA) to develop a detail for Complainant which would permit her to continue to work remotely. She alleged that despite initial interest in the detail, when Ms. Bray offered it to Complainant in September 2023, Complainant declined it on October 16, 2023. Ms. Bray hypothesized that Complainant's interest in the ECA detail appeared to wane after she learned that a close friend of hers would not be her supervisor. She related that Complainant told her that she desires to remain in Arizona because she lives with her parents to save money. Ms. Bray further stated that Complainant related that she could not return to D.C. for financial reasons unless she could receive medical treatment through DoD's AHI program, which is free. Ms. Bray concluded by stating that she received an e-mail from Complainant on January 10, 2024, with a request for a remote work assignment; she referred the request to DRAD at that time because DRAD was now authorized

to accept requests for RWA as a possible reasonable accommodation. ROI, pp. 544-546.

Ms. Bray continued that much of Complainant's work requires dealing with classified conversations and documents, which can only occur in an on-site setting. Accordingly, continuation of the remote work agreement would not be possible. She added that Complainant's work requires collaboration with colleagues and that while a structured flexible work schedule would be possible for Complainant's work in D.C., Complainant's request for an unstructured schedule allowing her to work at any time, including nights and weekends, is unacceptable. Ms. Bray referred any questions regarding the processing of Complainant's reasonable accommodation request to DRAD. She noted that Complainant was given a flexible work schedule as a reasonable accommodation in July 2023, and that it required core hours during which Complainant would be available. Ms. Bray clarified that Complainant needed the remote work agreement so that she could live with her parents and defray her large medical expenses, and that she could return to D.C. if she was accepted into the cost-free Walter Reed program. ROI, pp. 546-550, 560-562.

Ms. Bray set forth Sections 3 FAM 2843.2 and 3 FAM 2843.2-1 as the relevant regulations regarding mid-year progress reviews and noted that one documented progress review is required every rating cycle. She quoted the progress review she gave Complainant on July 20, 2023, which was based on Complainant's performance and highlighted several areas for improvement, including meeting deadlines, completing overdue projects, and coordination of work assignments. Ms. Bray noted that the progress review only provides feedback to the employee and is not a part of her Official Personnel Folder or rating of record. She indicated that Complainant did not request for her progress review summary to be reviewed by a higher-level official. ROI, pp. 550-554.

Ms. Bray continued that Complainant lapsed into AWOL status because she failed to submit paperwork regarding her leave status while Complainant remained outside of D.C. after the expiration of her remote work agreement on May 31, 2023. She reported that throughout August 2023, Complainant said that she would be submitting her FMLA forms, but that Complainant never completed doing so, and moreover, she informed Complainant on September 6, 11, 18, and 26, 2023 that she was running out of paid leave requiring Complainant to act

immediately. Ms. Bray indicated that Complainant eventually submitted her FMLA request on September 27, 2023, and that she was charged AWOL for September 12-22, 2023. She declared that she entered into a conversation with Complainant regarding her request to have the AWOL charges changed to LWOP. Ms. Bray noted that Complainant again lapsed into AWOL status for 80 hours in January 2024. She concluded that she approved changing the AWOLs for January 8 – January 21, 2024, to LWOP and that she emphasized to Complainant that she needed to ensure that her employment status was kept updated in a timely manner. ROI, pp. 554-557.

On May 9, 2023, Ms. Bray informed Complainant that her remote work agreement was extended to July 31, 2023, but that it would be necessary for Complainant to return to D.C. Ms. Bray further informed Complainant that there may be a detail available to allow Complainant to continue to work remotely, and that she should take leave if she was unable to return to D.C. ROI, pp. 580-582.

On July 3, 2023, Complainant stated that she had been offered a remote detail position which was supported by Ms. Bray, and that they were still working on the remote work agreement as a possible reasonable accommodation for Complainant's current position. Ms. Bray responded that any detail would require the approval of the receiving bureau. ROI, pp. 586-589.

On September 25, 2023, Complainant was notified that she was officially in an AWOL status, and that Complainant needed to provide documentation to Ms. Bray in order to get into a LWOP status. ROI, pp. 633-634.

Throughout late September-early October 2023, Ms. Bray worked with Complainant to determine if a remote detail could be approved, but Complainant ended up refusing the offered detail because she had serious concerns that she would be able to achieve the goals set out in the detail and that the work commitments could not realistically be achieved in 120-day increments. ROI, pp. 598-602.

On January 8, 2024, Ms. Bray notified Complainant that she was in an AWOL status due to the expiration of her FMLA-covered leave. Complainant responded to Ms. Bray's e-mail, requesting that the AWOL be changed to LWOP, and Ms. Bray approved the change on February 1, 2024. ROI, pp. 638-645.

Complainant was notified in an undated letter received on February 1, 2024, to return to her duty station in Washington D.C. no later than February 12, 2024, and explained why this action was required to further the mission of the office. ROI, pp. 620-623.

Testimony/Evidence from Other Witnesses

Witness 1 Daniel Gaush, Supervisory Management and Program Analyst

Mr. Gaush testified that he was a colleague of Complainant and that he was aware that Ms. Blum had decided to change Complainant's daily responsibilities so that the contract staff were guided by other individuals. He opined that while the position description's duties and responsibilities were descriptive, they were not necessarily prescriptive, and that supervisors can change daily responsibilities and work commitments as deemed necessary. Mr. Gaush testified that some third-party contract staff left their positions to work elsewhere, and another contractor staff member requested that they not been overseen by Complainant in the future. He related that Ms. Blum subsequently decided that Complainant's other duties and responsibilities were a higher priority and that others would oversee the remaining contractors. Mr. Gaush declared that contractor oversight is not mentioned as a part of Complainant's position description. He remarked that Ms. Blum asked him if she could adjust Complainant's daily responsibilities and he told her that she could do so. Mr. Gaush contended that after Ms. Blum told Complainant about the change, she argued that she needed to oversee contractors to maintain her grade and effectively serve as NET team lead. ROI, pp. 429, 433-435.

Mr. Gaush continued that Ms. Blum told Complainant that Complainant would no longer supervise Ms. Keener and that, as Mr. Gaush understood, the contractors did not want to be managed by Complainant. He denied Complainant's allegation that he told Complainant off-line to send any NET projects she had to him so he could decide if Ms. Keener would do them, and further stated that Ms. Blum made these statements. ROI, pp. 435-436.

Mr. Gaush noted that a prior supervisor had established a telework agreement for Complainant in 2020. The telework agreement did not permit telework outside the National Capital Region, and is considered a workplace flexibility tool, not a

reasonable accommodation. He added that subsequently, an RWA was established on June 1, 2022, with an end date of May 31, 2023, to allow Complainant to work from Arizona, again as a workplace flexibility matter and not a reasonable accommodation. Mr. Gaush stated that DRAD was not involved in establishing either of these two agreements. He recalled that Ms. Blum informed Complainant that the remote work agreement would not be extended or renewed, and that Complainant would need to report back to her duty station in Washington, D.C. or request leave. Mr. Gaush related that the failure to extend the agreement was due to Complainant's performance level and the need for her to access classified information which was only accessible in D.C. The new GEC leadership required that Complainant have access to classified briefings and systems in DC as part of GEC's revised counter disinformation and counter proposition mission. ROI, pp. 436-437.

Mr. Gaush alleged that Complainant requested a reasonable accommodation from DRAD around March 2023 and that he advised Ms. Blum that she had an employee who had requested a reasonable accommodation, and that he had no further involvement in this matter. He indicated that Ms. Blum determined that the remote work agreement was no longer consistent with Complainant's ability to perform the duties and responsibilities of her position, especially regarding access to classified meetings and systems. Mr. Gaush declared that Complainant discussed her request for workplace flexibility with him in the spring of 2023, and that she indicated that she needed continuance of the remote work agreement and flexible work schedule in order to be able to work while undergoing medical treatment, and awaiting a DoD determination as to whether she could be treated at Walter Reed Hospital. He noted that remote work outside of an individual's official duty station requires several levels of approval pursuant to 3 FAM 2380. ROI, pp. 437-441.

Mr. Gaush set forth the general criteria for a supervisor in reviewing a subordinate's performance, but averred that he was otherwise unaware of Complainant's performance progress review. He related that he had no involvement in Complainant's leave being marked as AWOL. Mr. Gaush denied any responsibility regarding the reevaluation of Complainant's remote work agreement, and noted that that decision was made by Ms. Blum based on Complainant's performance and the needs of the position and the office. He reiterated that the agreement was a workplace flexibility tool and not a

reasonable accommodation, and that Complainant was aware that she had to request reasonable accommodation through DRAD. Mr. Gaush contended that performance goals are typically initially formulated without involvement of an employee, and then the employee is presented with them and asked for feedback. He maintained that employees are not allowed a veto power over goals and that the supervisor can establish goals, even if the employee does not fully agree with them as long as they are consistent with the position description. ROI, pp. 441-447.

On March 3, 2023, Complainant e-mailed Mr. Gaush regarding Ms. Keener being shifted to work directly from Ms. Blum, and indicated that she might not be able to stay in the office if that occurs. ROI, pp. 452-454.

Witness 2 Christopher Brown, Program Analyst, DRAD

Mr. Brown stated that he was assigned to Complainant's reasonable accommodation requests. He related that her legal representative requested that the Agency approve a Secretarial Designation to transfer Complainant to Walter Reed Hospital's National Intrepid Center of Excellence (NICOE) program to evaluate Complainant's AHI. Mr. Brown added that on May 9, 2023, he was informed that Complainant's remote work agreement was being extended for two additional months to allow Complainant to attend medical appointments. Mr. Brown explained that DRAD processes and decides all reasonable accommodation requests for the Agency and that Complainant's request was initiated by her legal representative on March 21, 2023. He noted that Complainant was determined to be a qualified individual with a disability, and that she requested as a reasonable accommodation that she be allowed to continue her remote work agreement and flexible work schedule, and that a contractor be hired to act for her during her absences. Mr. Brown declared that he spoke to management about the first two requests, but the third request was not possible as a reasonable accommodation because it would remove essential functions of Complainant's position. He contended that Complainant was allowed to extend her remote work agreement by two months and develop a trial flexible work schedule, so her accommodation request was not denied. ROI, pp. 690-694.

Summary of Other Documentary Evidence in the Record

3 FAM 2331.3 defines core hours as the daily hours during which employees on a flexible work schedule must be present for work. ROI, p. 805.

3 FAM 2334.1(c) provides that alternative work schedules may be altered or terminated when, among other things, the alternative work schedule adversely affects the employee's performance. ROI, p. 813.

3 FAM 2362.1(c) provides that telework is not an entitlement and does not create any enforceable right. ROI, p. 834.

3 FAM 2362.1(e) provides that telework agreements must be reviewed at least annually, or if there is a material change in position functions. ROI, p. 834.

3 FAM 2362.1(m) provides that telework agreements may be cancelled, suspended or modified pursuant to 3 FAM 2362.2 with two pay period's notice. ROI, p. 835.

3 FAM 2381.1(a) provides that remote work agreements are full-time core telework arrangements where the alternate worksite is outside the locality pay area of the regular worksite for the position of record. ROI, p. 849.

3 FAM 2381.1(b) provides that remote work agreements are workplace flexibility arrangements to be approved on a case-by-case basis. ROI, p. 849.

3 FAM 2381.8 provides that remote work agreements can be cancelled, suspended or modified based on the needs of the office at any time with prior notification of two pay periods. ROI, p. 857.

3 FAM 2381.10(b) provides that remote work agreements for positions that require access to and/or handling of classified information must be located in a secure Department location. ROI, p. 858.

3 FAM 2841.2-6(e) defines the mid-point progress review as a supervisor requirement to evaluate an employee's performance at the mid-point of the performance year. ROI, p. 863.

3 FAM 2843.2-1 provides the appropriate subjects to be covered during a mid-point progress review. ROI, p. 873.

Based on the evidence in the record, management has provided its non-discriminatory reasons for its actions. This summary will now address evidence of pretext Complainant provided.

Rebuttal

Complainant asserted that her medical condition and EEO activity were the reasons why her training duties had been taken away from her. That action occurred contemporaneously with the unwarranted reopening of her reasonable accommodations, that Complainant's remote work, which was part of her reasonable accommodation, was one of the reasons why Ms. Blum gave for taking over supervision of Ms. Keener. This event occurred within a month of Complainant's return to work after extended medical leave. She added that Ms. Blum also transmitted an article discrediting AHI victims, and asked a colleague if she believed that Complainant suffered from Havana Syndrome. Complainant related that her medical condition and EEO activity were the reasons why her reasonable accommodations were removed, her request for reasonable accommodation denied, no valid reason was given for management's action so discrimination was the only possible reason for it. She indicated that management's retaliatory actions were taken shortly after she initiated the instant complaint. Complainant noted that Ms. Bray forced Complainant to come out of approved sick leave to receive the mid-year progress review, and that many incorrect and inaccurate statements contained in that review were based on Complainant's medical conditions. She asserted that the review was retaliatory as Complainant had only received superlative ratings in the past along with multiple performance awards, and that Ms. Bray had never complained about Complainant's work in the past until Complainant filed the instant complaint. ROI pp. 36, 101-102, 114-115, 123-124, 140.

Ms. Blum denied that Complainant's medical condition or protected activity were factors in the removal of Ms. Keener from Complainant's supervision and emphasized that Ms. Keener would be dealing with classified information which Complainant could not access due to her working remotely. She added that although she was not involved with the reasonable accommodation decision, she

had no reason to believe that it was based on Complainant's protected activity. ROI, p. 480, 486.

Ms. Bray denied that Complainant's medical condition or protected activity were factors in the change in supervision of Ms. Keener, the mid-point progress review, or her being charged AWOL. ROI, pp. 542, 554, 557.

Mr. Gaush denied that Complainant's medical condition or protected activity were factors in the change in Ms. Keener's supervision. Mr. Brown denied that Complainant's medical condition or protected activity were factors in how she was treated regarding her reasonable accommodation. ROI, pp. 436, 694-695.

## <u>Legal Framework</u>

Discrimination based on race, color, national origin, religion, sex (including sexual orientation, sexual identity, and pregnancy), and reprisal for prior protected EEO activity and/or opposing discriminatory policies or practices is prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e17.

The Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, *et5 seq.*, prohibits discrimination against qualified individuals with disabilities on the basis of their disabling conditions. It also requires employers to provide reasonable accommodation to qualified individuals with a disability provided doing so does not impose an undue hardship on the employer.

### <u>Disparate Treatment</u>

To prevail under a disparate treatment theory, Complainant must satisfy a three-part evidentiary scheme. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). First, Complainant must establish a *prima facie* case by demonstrating that he or she was subjected to an adverse employment action under circumstances that would support an inference of discrimination. *McDonnell Douglas,* 411 U.S. at 802; *Furnco Constr. Co. v. Waters,* 438 U.S. 567, 576 (1978). Second, the burden shifts to the Agency to articulate a legitimate, nondiscriminatory reason for its actions. *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Third, should the Agency carry its burden, Complainant must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the Agency were not its true reasons, but were a pretext for discrimination.

*McDonnell Douglas,* 411 U.S. at 804; *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993).

To meet management's burden of articulating legitimate non-discriminatory reasons, the reasons given must be sufficient to raise a genuine issue of material fact as to whether the actions taken were motivated by an unlawful discriminatory bias. It is Complainant's ultimate burden to prove by a preponderance of the evidence that the employer intentionally discriminated against him/her based on his/her protected status. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).

Once management has provided its legitimate non-discriminatory reason(s) for its actions, Complainant has the burden of proving that management's stated reason(s) is (are) not only pretext, but is (are) pretext for intentional discrimination. *Andres M. v. USPS,* EEOC Appeal No. 0120181837 (Aug. 13, 2019), *citing Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1129 (7th Cir. 1997). Complainant can do this directly by showing that the Agency's proffered explanation is unworthy of credence. *Shad R. v. USPS*, EEOC Appeal No. 2022004404 (May 11, 2023), *citing Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981).

Complainant can demonstrate that the Agency's reason for its action was pretextual, that is, not the true reason for the Agency's action, by showing that the reason offered by management is factually baseless, is not the actual motivation for the action, or is insufficient to have motivated the action. *Andres M. v. USPS*, EEOC Appeal No. 0120181837 (Aug. 13, 2019), *citing Tincher v. Wal-Mart Stores, Inc.,* 118 F.3d 1125, 1130 (7th Cir. 1997) *and Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

Pretext may be supported by evidence of unequal applications of agency policy. *Andres M. v. USPS*, EEOC Appeal No. 0120181837 (Aug. 13, 2019), *citing Harris v. Dep't of the Army,* EEOC Request No. 05940999 (Mar. 14, 1996). "Pretext can be demonstrated by 'showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Agency's] proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence.'" *Mitchell M. v. Dep't of Homeland Security, Transp. Sec. Agency,* EEOC Appeal No. 2021005133 (Jan. 31, 2023), *citing Dalesandro v.*

*United States Postal Serv.,* EEOC Appeal No. 01A50250 (Jan. 30, 2006), *quoting Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

To prevail, Complainant must have shown that, in spite of management's articulated non-discriminatory explanation, an overall inference of discrimination could be discerned by a preponderance of the evidence. In other words, Complainant must have shown that the Agency was "more likely motivated by discriminatory reasons" than not. *Bailey v. USPS*, EEOC Appeal No. 01A21715 (Mar. 10, 2003); *Brown v. USPS*, EEOC Appeal No. 01A21561 (Feb. 18, 2003). Or, Complainant could have shown that the proffered explanation of the Agency was unworthy of credence. *Burdine*, 450 U.S. at 256. Essentially, the record must have shown that the Agency articulated a false reason and that its real reason was discrimination. *Hicks*, 509 U.S. at 515 (1993).

The question is not whether the Agency made the best, or even a sound, business decision; it is whether the real reason is discrimination. A pretext inquiry is not concerned with bad judgment, impeccability, dislike, or a mistake. *Cary J. v. Dep't of State*, EEOC Appeal No. 2021005135 (Jan. 31, 2023), *citing Marvin W. v. Dep't of Homeland Sec.,* EEOC Appeal No. 0120170438 (Dec. 12, 2018). Rather, the focus of a pretext inquiry is whether an agency's actions were motivated by discriminatory animus. At all times the ultimate burden of persuasion remains with Complainant to demonstrate by a preponderance of the evidence that the Agency was motivated by prohibited discrimination. *Joan V. v. Dep't of Veterans Affairs*, EEOC Appeal No. 2022002963 (Apr. 20, 2023), *citing Alameda B. v. Dep't of the Treasury,* EEOC Appeal No. 0120181968 (Sept. 24, 2019). *See also Board of Trustees of Keene College v. Sweeney*, 439 U.S. 24, 25 N.2 (1978).

This established order of analysis in discrimination cases, in which the first step normally consists of determining the existence of a *prima facie* case, need not be followed in all cases. Where the Agency has articulated a legitimate, nondiscriminatory reason for the personnel action at issue, the factual inquiry can proceed directly to the third step of the *McDonnell Douglas* analysis, the ultimate issue of whether Complainant has shown by a preponderance of the evidence that the Agency's actions were motivated by discrimination. *Jamey M. v. Dep't of Justice, Fed. Bureau of Prisons,* 2022001150 (May 11, 2023), *citing U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 713-714 (1983); *Hernandez v. Dep't. of Transp.,* EEOC Request No. 05900159 (June 28, 1990); *Peterson v. Dep't.*

*of Health and Human Serv.,* EEOC Request No. 05900467 (June 8, 1990); *and Washington v. Dep't. of the Navy,* EEOC Petition No. 03900056 (May 31, 1990).

Discrimination based on Disability

In analyzing a disparate treatment claim under the Rehabilitation Act, the burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. § 792 (1973), applies. Under this analysis, in order to establish a *prima facie* case, complainants must demonstrate that: (1) they are an "individual with a disability," that is, the individual is substantially limited in one or more major life activity; (2) they are a "qualified" individual with a disability because they can perform the essential functions of the position held or desired either with or without a reasonable accommodation; (3) they were subjected to an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination because of the individual's status as an individual with a disability.

In determining if an individual is substantially limited in a major life activity, the EEOC's regulations require that the ability of the person to perform a major life activity must be compared to "most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). An appropriate analysis examines not just what the individual cannot do, but also what the individual *can* do.

Essential functions are the fundamental job duties of the employment position the individual with a disability holds or desires. 29 C.F.R. § 1630.2(n). A function may be essential, for example, because the reason the position exists is to perform that function or there are a limited number of employees available among whom the performance of that job function can be distributed. *Id.* at § 1630.2(n)(2). Evidence of whether a particular function is essential includes the employer's judgment as to which functions are essential; written job descriptions; and the amount of time spent on performing that function. *Id.* at § I630.2(n)(3). *See Lynnette M. v. Dep't of Veterans Affairs*, EEOC Appeal No. 2021005137 (Mar. 21, 2023) (finding hands-on patient care was an essential function and telework would not have been an effective accommodation).

The individual must be a qualified individual with a disability at the time the employment decision is made, not at some time in the future. The EEOC has

stated that employment decisions must be based on the person's ability to perform the job now, not whether the person might be unable to perform the job in the future. See Appendix to 29 C.F.R. § 1630.2(m).

Failure to Accommodate (Disability)

Agencies are required to reasonably accommodate the known limitations of qualified individuals with disabilities unless they can show that doing so would result an undue hardship upon their operations. See 29 C.F.R. §§ 1630.2 (o), (p); EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, EEOC Notice No. 915.002 (Oct. 17. 2002); *Jack P. v. Dep't of the Interior, USGS*, EEOC Appeal No. 2022001404 (May 11, 2023), *citing* Barney *G. v. Department of Agriculture,* EEOC Appeal No. 0120120400 (December 3, 2015).

An Agency is required to make reasonable accommodation to the known physical and mental limitations of an otherwise qualified individual with a disability unless the Agency can show that accommodation would cause an undue hardship. *Jack P. v. Dep't of the Interior, USGS*, EEOC Appeal No. 2022001404 (May 11, 2023); *Diane H. v. Dep't of State*, EEOC Appeal No. 2021000882 (Sept. 26, 2022), *citing Barney G. v. Dep't of Agric.,* EEOC Appeal No. 0120120400 (Dec. 3, 2015). See also 29 C.F.R. § 1630.9. In order to establish that she was denied a reasonable accommodation, Complainant must show that: (1) she is an individual with a disability, as defined by 29 C.F.R. 1630.2(g); (2) she is a qualified individual with a disability pursuant to 29 C.F.R. § 1630.2(m); and (3) the Agency either failed to provide a reasonable accommodation or failed to provide an effective reasonable accommodation. *See Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act*, EEOC No. 915.002 (Oct. 17, 2002) ("Enforcement Guidance").

A complainant must satisfy the threshold requirement that he or she is a "person with a disability" as that term is defined in the applicable statutes and Equal Employment Opportunity Commission regulations. Title 42, United States Code, Section 12102(1) and 29 C.F.R. § 1630.2(g)(1) define a person with a disability as an individual who: (i) has a physical or mental impairment which substantially limits one or more of that person's major life activities (referred to elsewhere in



SBU -PRIVACY OR PII

the regulations as "actual disability"); (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment.

The term "qualified," with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position. 29 C.F.R. § 1630.2(m). An agency is required to make reasonable accommodation to the known physical and mental limitations of a qualified individual with a disability unless the Agency can show that accommodation would cause an undue hardship. See 29 C.F.R. §§ 1630.2(o), (p). *See Aline A. v. Dep't of Agriculture, Agricultural Research Servc.*, EEOC Appeal No. 2022003111 (Mar. 8, 2023). The complainant has the burden of proving that he or she is a "qualified individual."

The complainant has the initial responsibility of showing that a suggested accommodation is "reasonable" (i.e., that is generally plausible in the job being performed by the individual). *Shenika B. v. Dep't of Veterans Affairs, Natnl. Cemetery Admin.*, EEOC Appeal No. *2021004485 (Aug.* 17, 2022). Once the complainant shows that the requested accommodation is plausible, the burden then shifts to the agency to show whether the accommodation, even if plausible, would nonetheless impose an undue hardship (i.e., a significant difficulty or expense) on the operations of the agency. *Shenika B., supra; see also Harge v. Dep't of Veteran's Affs*., EEOC Appeal No. 0120111521 (Dec. 4, 2014).

After receiving a request for reasonable accommodation, the employer should engage in an informal process with the disabled individual to clarify what the individual needs and identify the appropriate reasonable accommodation. *Casandra N. v. Dep't of Veterans Affairs*, EEOC Appeal No. 2022001152 (May 10, 2023), *citing* EEOC Enforcement Guidance No. 915.002 *and Abeijon v. Dep't of Homeland Sec*., EEOC Appeal No. 0120080156 (Aug. 8, 2012). Protected individuals are entitled to reasonable accommodation, but they are not necessarily entitled to their accommodation of choice. *Arturo A. v. USPS*, EEOC Appeal No. 2022001388 (Jan. 31, 2023), *citing Castaneda v. U.S. Postal Serv*., EEOC Appeal No. 01931005 (Feb. 17, 1994).

The factors to be considered in determining whether an undue hardship exists are set out in the statute and regulations and include the nature of the

accommodation; the financial and other resources of the facility or the employer; and the type of operations in which the employer engages. 42 U.S.C. § 12111(10) and 29 C.F.R. § 1630.2(p).

The employer is not required to accommodate an individual by eliminating or substantially modifying the essential functions of a complainant's job. *Dwayne F. v. Dep't of the Navy*, EEOC Appeal No. 0120143267 (Mar. 11, 2016), *citing Dimiceli v. United States Postal Service,* EEOC Appeal No. 01900961 (Mar. 30, 1990) (internal citations omitted). See also *Lynnette B. v. Dep't of Justice, Bureau of ATFE*, EEOC Appeal No. 2019003392 (Aug. 25, 2022), *citing Turco v. Hoechst Celanese Corporation*, 101 F.3d 1090, 1093-1094 (5th Cir. 1996); *Shiring v. Postmaster General*, 90 F.3d 827, 831-832 (3rd Cir. 1996); *and Watson v. Lithonia Lighting and National Service Industries, Inc.*, 304 F.3d 749 (7th Cir. 2002), cert. denied 123 S. Ct. 1286 (2003).

The Commission has held that an agency's failure to "properly engage in the interactive process, does not, by itself, demand a finding that [Complainant] was denied a reasonable accommodation." *Lynnette B. v. Dep't of Justice, Bureau of ATFE*, EEOC Appeal No. 2019003392 (Aug. 25, 2022), *quoting Complainant v. Dep't of Homeland Security*, EEOC Appeal No. 0720150027 (Mar. 15, 2016) *and citing Broussard v. USPS*, EEOC Appeal No. 01997106 (Sept. 13, 2002). "Rather, to establish a denial of a reasonable accommodation, [Complainant] must establish that the failure to engage in the interactive process resulted in the agency's failure to provide a reasonable accommodation." *Id.*

<u>Hostile Work Environment Harassment</u>

An employer is subject to vicarious liability for harassment when it is created by a supervisor with immediate (or successively higher) authority over the employee. *See Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998). However, where the harassment does not result in a tangible employment action (*e.g.*, a discharge, demotion, or undesirable reassignment), the employer can raise an affirmative defense, which is subject to proof by a preponderance of the evidence. The employer must demonstrate that it exercised reasonable care to prevent and correct promptly any harassing behavior, and the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Burlington Industries, supra*; *Faragher,*

*supra*; *Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors,* EEOC Notice No. 915.002 (June 18, 1999).

To establish a claim of hostile work environment harassment, a complainant must show that: (1) he or she belongs to a statutorily protected class; (2) he or she was subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on his statutorily protected class; (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. *Sarah S. v. USPS*, EEOC Appeal No. 2021003399 (Mar. 15, 2023), *citing Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982). The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. Enforcement Guidance on *Harris v. Forklift Systems Inc.*, EEOC Notice No. 915.002 at 6 (Mar. 8, 1994).

To prove a claim of illegal discriminatory harassment, Complainant must establish that she was subjected to conduct that was either so severe or so pervasive that a "reasonable person" in Complainant's position would have found the conduct to be hostile or abusive. Complainant must also prove that the conduct was taken because of her protected bases. Only if Complainant establishes both of these elements – hostility and motive – will the question of Agency liability present itself. *Alexandria P. v. USPS*, EEOC Appeal No. 2022000615 (Feb. 27, 2023).

The antidiscrimination statutes are not civility codes. Rather, they forbid "only behavior so objectively offensive as to alter the conditions of the victim's employment." *Buster D. v. Dep't of State*, EEOC Appeal No. 2021004475 (Dec. 14, 2022), *citing Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998). Therefore, to prove a harassment claim, a complainant must establish that she was subjected to conduct that was either so severe or so pervasive that a "reasonable person" in complainant's position would have found the conduct to be hostile or abusive. Complainant must also prove that the conduct was taken because of her protected class. Only if complainant establishes both of those elements, hostility and motive, will the question of Agency liability present itself.

<u>Reprisal</u>

When Complainant alleges reprisal, a *prima facie* case analysis is necessary to determine critical threshold issues.

To establish a *prima facie* case of reprisal, Complainant must show that (1) he engaged in protected EEO activity; (2) the Agency was aware of the protected activity; (3) subsequently, he was subjected to adverse treatment by the Agency; and (4) a nexus exists between his protected activity and the adverse treatment. *Jack P. v. Dep't of the Interior, USGS*, EEOC Appeal No. 2022001404 (May 11, 2023), *citing Whitmire v. Dep't of the Air Force,* EEOC Appeal No. 01A00340 (Sept. 25, 2000).

Protected activity includes participation in the discrimination complaint process or opposition to discrimination. EEOC Enforcement Guidance on Retaliation and Related Issues, EEOC Notice No. 915.004, § II (Aug. 25, 2016). A complainant may establish prior EEO activity by participating at any stage of the EEO process or opposing unlawful discriminatory conduct. See, generally, *Lewis v. Dep't of the Navy*, EEOC Appeal No. 01810158 (May 22, 1981) (counseling stage), *request for reconsideration denied*, EEOC 05820105 (Sept. 17, 1982); *Ballard v. U.S. Postal Service*, EEOC Appeal No. 01923276 (Aug. 17, 1992) (witness); and *Burrough v. U.S. Postal Service*, EEOC Appeal No. 01842417 (June 24, 1986) (representative).

A complainant may also establish a *prima facie* case by presenting evidence which, if it was not explained, would reasonably give rise to an inference of reprisal. *Mike T. v. USPS*, EEOC Appeal No. 2022001912 (Mar. 16, 2023), *citing Shapiro v. Social Security Administration*, EEOC Request No. 05960403 (Dec. 6, 1996). Obviously, the complainant must offer evidence that the agency officials who took the action were aware of his or her prior participation or opposition activity, but establishing that alone will not enable a complainant to establish the causal connection element of a *prima facie* case. *Garcia-Gannon v. Department of the Air Force*, EEOC Appeal No. 01821195 (June 30, 1983).

Adverse actions need not be ultimate employment actions, just adverse treatment based on a retaliatory motive, which could deter a reasonable person from engaging in protected activity. *Burlington Northern Santa Fe Railway Company v. White*, 548 U.S. 53 (2006); *Brenton W. v. USPS,* EEOC Appeal No. 2023000952 (Mar. 9, 2023), *citing Lindsey v. U.S. Postal Service*, EEOC Request No. 05980410

(Nov. 4, 1999) and EEOC Compliance Manual, Section 8.D.3, Notice No. 915.003 (May 20, 1998).

The causal connection may be inferred by evidence that the protected conduct was closely followed by the adverse action. *Clark County School District v. Breeden*, 532 U.S. 286 (2001). The Court in *Breeden* noted that where a complainant is relying on temporal proximity to establish a causal connection between prior protected activity and a current adverse employment action, that proximity must be "very close" and cited with approval Circuit Court of Appeals decisions holding that time gaps of three to four months between an individual's prior EEO activity and the current adverse employment action were too attenuated to suggest an inference of retaliation. The Commission has followed suit and rendered decisions establishing much shorter time frames to establish the requisite temporal proximity. See, for example, *Heads v. U.S. Postal Service*, EEOC Appeal No. 01A51547 (June 2, 2005); *Archibald v. Department of Housing and Urban Development*, EEOC Appeal No. 01A54280 (September 22, 2005); and *Lynch v. U.S. Postal Service*, EEOC Appeal No. 01A24705 (August 14, 2003).

The Agency, as the employer, has broad discretion to carry out personnel decisions, absent evidence of unlawful motivation. *Buster D. v. Dep't of State,* EEOC Appeal No. 2021004475 (Dec. 14, 2022), *citing Laurice S. v. Soc. Sec. Admin.,* EEOC Appeal No. 0120180646 (June 21, 2019).

**Application of Fact to Law**

Accommodation

As set forth above, in order to establish a *prima facie* case of disability discrimination due to a failure to accommodate, Complainant must show that: (1) she is an individual with a disability, as defined by 29 C.F.R. 1630.2(g); (2) she is a qualified individual with a disability pursuant to 29 C.F.R. § 1630.2(m); and (3) the Agency either failed to provide a reasonable accommodation or failed to provide an effective reasonable accommodation.

Complainant has made two separate arguments regarding reasonable accommodation. First, she claimed that management had revoked a reasonable accommodation she was given in the 2019-2022 timeframe. Second, she claimed that DRAD's denial of her more recent reasonable accommodation request was discriminatory.

As to her first argument, the record contains numerous documents from medical providers, Complainant, and her previous managers regarding Complainant's permission to maintain a flexible work schedule and work remotely from Arizona. However, none of those documents show any interaction with DRAD or approval by DRAD of these arrangements as a reasonable accommodation. Indeed, on December 9, 2019, David Paine, Complainant's supervisor at that time, told Complainant that DRAD had told them to "figure it out" for themselves. The work schedule and telework agreement that were approved in 2019, 2021, and 2022 did not have clearance or approval from DRAD. Indeed, DRAD took the position until only recently, that they could not grant a remote work agreement as a reasonable accommodation. Accordingly, management's position that those earlier agreements were based on workplace flexibility and not a reasonable accommodation is correct, and Complainant's argument that she had a reasonable accommodation rescinded is without merit. ROI, pp. 217-238.

In her second argument, Complainant claimed that DRAD's denial of her reasonable accommodation request was incorrect and that she should be granted a remote work agreement, a flexible work schedule and a contractor to take her place when she is away from work. Complainant testified that she suffers from AHI resulting in a traumatic brain injury, which is supported by her medical documentation. Complainant's medical documentation states that Complainant needs to attend an average of five medical appointments weekly during normal core working hours and recommended that Complainant be given a flexible work schedule and allowed to work remotely from Arizona until she is admitted to Walter Reed's program.[1]
ROI, pp. 214-216, 255-257.

[1] On July 26, 2023, the Complainant was issued a "Secretarial Designation" authorizing her to receive cost free medical care at Walter Reed's program. ROI, p.367-369

The Complainant has shown that she is an individual with a disability. However, she must also show that she is a qualified person with a disability, meaning that she can perform the essential functions of her job with or without an accommodation. 29 CFR § 1630.2(m). Essential functions of a job are duties that an employee must perform or the outcomes that must be achieved by the employee. 29 CFR § 1630.2(n), *Ta v. U.S. Postal Serv., EEOC Appeal No. 0120080612 (Dec. 23, 2013)* Supervisory Management and Program Analyst, Daniel Gausch, testified that new GEC leadership was reorganizing the GEC and as a result, Complainant must be able to access classified briefings and systems as part of GEC's revised counter disinformation and counter proposition mission. ROI, p 436. Senior Advisor and Complainant's supervisor, Orna Blum, echoed Mr. Gausch's testimony stating that, in response to recommendations of the Office of the Inspector General and in line with the priorities of the new special envoy, Ms. Bray was implementing an office-wide reorganization for the GEC, and therefore wanted to be engaged in establishment of work objectives for Complainant. ROI, pp. 496, 513. Moreover, Ms. Blum engaged the Complainant in an email conversation about her work requirements including the actions and activities that are essential and how they relate to Complainant's position description. ROI, pp. 511-515. Based on the foregoing, engaging in ongoing conversations and coordination in a classified setting are essential functions of the Complainant's position in GEC. Although Complainant claimed that her position does not involve working with classified information, this statement does not account for the reorganization of the GEC and Complainant's updated work requirements. Moreover, it is undisputed that the employer determines the essential functions of a position. *See EEOC v. Ford Motor Company, 782 F. 3d 759* citing *Mason v. Avaya, 357 F.3d at 1122(10th Cir. 2004)*, "Neither the statute nor regulations nor EEOC guidance instructs courts to credit the employee's opinion about what functions are essential. That's because we do not 'allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience.' EEOC v. Ford Motor Company, 782 F.3D 759.. (a)nd for good reason: If we did, every failure-to-accommodate claim involving essential functions would go to trial because all employees who *request* their employer to exempt an essential function *think* they can work without that essential function." (*emphasis in the original).* For this reason. the position's duty station remains Washington, D.C. Accordingly, Complainant was recalled to work at the duty station to perform the essential functions of her position.

The Complainant is not a qualified individual with a disability if she cannot perform the essential functions of her position with or without an accommodation. 29 CFR § 1630.2(m). The RWA is the accommodation of Complainant's choice. If the RWA were implemented, however, the Complainant would not be able to access secure systems and secure environments in which to perform her position's essential functions. As Ms. Blum testified, while on an RWA, Ms. Hogg was not able to perform the following duties: 1) Communications, planning and work on SIPR that forms a bulk of our work in new projects for 2023; 2) Research and analysis on classified systems used by GEC (SIPR and JWICS/E-Intel) on emerging threats and cross-cutting issues that were relevant to NET's work; 3) Access to in-person sensitive meetings, discussions, and Secret Video Conferencing; and 4) Representation in classified interagency meetings. [2] Moreover, Ms. Hogg declined to travel to Washington for interim sensitive/classified discussions, or overseas for implementation of training and other NET work. ROI, p. 477. Accordingly, if the Agency were to authorize a RWA for Ms. Hogg, she would not be a qualified person with a disability because she could not perform her essential functions with her preferred accommodation. Accordingly, the Agency declined to authorize a RWA as it would be an ineffective accommodation. That said, the Agency could provide alternative accommodations that would assist the Complainant in performing her position's essential functions.

The Agency has considered and provided to Complainant other types of reasonable accommodation (not RWA) that could establish Complainant as a qualified person with a disability because the combination of accommodations would assist the Complainant in performing the essential functions of her job in the Washington area. For example, the Agency had offered a variable schedule whereby the Complainant could complete eight hours of work within a twelve-hour period with only a portion of that time scheduled as "core hours" that the Complainant would have to be available. ROI, p.104. Additionally, the Agency had offered non-remote telework for portions of the work week, as well as workplace flexibility to accommodate Complainant's many medical appointments. ROI, p.108. Additionally, the Agency responded to Complainant's accommodation request by hiring a contractor to assist the Complainant which DRAD later determined to be impermissible because this would remove an essential function. ROI, pp. 693-694 Moreover, although not required to, the Agency went as far as

[2] SIPR and JWICS are classified computer systems used at the Department of State.

agreeing to Complainant's request for a year-long detail assignment in another bureau that allowed remote work which Complainant later rejected. ROI, pp. 598-599. The Agency has been available to consider any combination of accommodations that would assist the Complainant to perform the essential functions or seek a position that allowed remote work. The Agency has the ultimate discretion in providing the accommodation as long as the accommodation is effective, that is the accommodation removes the workplace barrier that is impeding the individual with the disability. ***See*** *Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA,* U.S. Equal Employment Opportunity Commission. The Agency has the discretion and interest of offering to the Complainant a combination of accommodations that gives the Complainant access to secure environments to conduct the essential functions of her position while also providing flexibility to address the Complainant's medical conditions.

An accommodation is any change in the work environment or the way things are customarily done to remove workplace barriers for individuals with disabilities. *id.* Complainant, however, continued to request an RWA, not to remove a barrier to the workplace but rather to improve her financial situation. Complaint stated through counsel that receiving the "Secretarial Designation" would "actually allow her to return to D.C." ROI, p. 360 Additionally, Complainant directly raises her financial situation with Senior Advisor Blum, stating in an email dated January 4, 2023, "I can't afford to move back to D.C. due to the hefty medical costs I'm paying out of pocket right now. This is why my legal team is working with Senator Kelly to get Congressional Nomination for free treatment at Walter Reed so I can finally move home!" ROI, p. 518. On July 26, 2023, the Complainant was issued a "Secretarial Designation" authorizing her to receive cost free medical care at Walter Reed's program. ROI, p.367-369. Notwithstanding that a reasonable accommodation is only intended to remove a workplace barrier, the Complainant's ability to receive cost-free medical care in the National Capital Area removes any financial obstacle to returning to the duty station.

Since Complainant was not qualified for her position, there was no requirement to furnish her with a reasonable accommodation. Alternatively, DRAD's denial of her reasonable accommodation request for a remote work agreement was justified because permitting it would result in the removal of an essential function

of her position. Accordingly, Complainant has not established a *prima facie* case of disability discrimination due to a failure to accommodate. ROI, pp. 370-372.

Reprisal

We will assume for the sake of argument that Complainant has met all the elements of her *prima facie* case of reprisal discrimination.

Disparate Treatment

As an initial matter, Complainant does not meet some elements of her *prima facie* case of disability discrimination. Furthermore, Complainant has not alleged that anyone was similarly situated to her and was treated differently than she was treated.

Even if Complainant's *prima facie* cases had been met, she has not r met her burden of showing that management's actions were due to her disability or protected activity. The removal of oversight of Ms. Keener was based on Complainant's inability to manage her properly; the ending of her remote work agreement was due to changes in the work of the office to include the ability to work on ClassNet thus requiring Complainant to return to D.C.; the progress review was well -supported; and the AWOL charge was the result of Complainant's failure to timely file appropriate documents requesting FMLA. None of these areas show an intent to discriminate. Moreover, management showed significant effort to address Complainant's situation, including trying to find her a detail where she could work remotely, and approving her extended leave while she reviewed and pursued other options. Management has repeatedly denied under oath that Complainant's medical condition and/or her engagement in protected activity were factors in their action, and there is no evidence, apart from Complainant's unsubstantiated allegations which contradicts that testimony.

Management has established its non-discriminatory reasons for its actions. Complainant's allegations were not supported by the totality of the record, and she failed to present any plausible evidence that would have demonstrated that management's reasons for its action were factually baseless or not its actual motivation. *Reeves v. Sanderson Plumbing Products, Inc*, *supra*. It should be

noted that a complainant's subjective beliefs cannot be probative evidence of pretext, and therefore, cannot be the basis of judicial relief. *Elliot v. Group Medical & Surgical Service*, 714 F.2d 556, 557 (5th Cir. 1983), *cert. denied*, 467 U.S. 1215, (1984). Complainant cannot second-guess the wisdom of the agency's business decisions. Thus, agencies are free to discharge, promote, demote, or transfer individuals for any reason, fair or unfair, so long as the decision is not a pretext for discrimination. *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir. 1984).

In other words, there was nothing that showed by a preponderance of the evidence that the legitimate explanations given by the agency were pretext for discrimination. *Hammons v. HUD,* EEOC Request No. 05971093 (May 5, 1999). Hence, Complainant has not shown that the explanation of the agency for its actions were simply a pretext for discrimination.

Hostile Work Environment Harassment

As to her claim of hostile work environment harassment, Complainant alleged that management's actions were undertaken to try to undermine her and force her out of the office, and that no reason was provided for taking Ms. Keener away from Complainant. She related that in addition to the removal of her reasonable accommodation and the unfair mid-year review, numerous other actions already described in her testimony taken by Ms. Blum and Ms. Bray constituted harassment as well as being discriminatory. Complainant asserted that she reported the harassment to the relevant individuals, but that no investigation of her concerns was ever conducted. She claimed that the harassment continues, with her being on unpaid leave, being directed to return to D.C., and other unresolved issues set forth in her complaint. ROI, pp. 102, 128-131.

Mr. Gauch indicated that Complainant told him that she did not know if she could stay with the Agency if the remote work agreement was rescinded, but that she never told him that she was being subjected to a hostile work environment. He added that she did not tell him that her performance goal or anyone's actions contributed to a hostile work environment. Mr. Gaush related that Complainant brought several issues to the attention of her union representative in the spring of 2023. He denied that Complainant's medical condition or protected activity

were factors regarding her claims of harassment or a hostile work environment. ROI, pp. 446-449.

Ms. Blum claimed that she was unaware of Complainant's claims of a hostile work environment. She denied that she reevaluated Complainant's current accommodations and emphasized that Complainant did not have an official accommodation with DRAD. Ms. Blum related that Complainant was unable to meet the deadline for establishing her work requirements, so Ms. Blum and Ms. Bray drafted objects for Complainant and sent them to her for review. She continued that Complainant did not claim that either of these actions created a hostile work environment. Ms. Blum concluded that management dealt with Complainant with compassion and diligence, working with her on her requests and helping her to try to find a detail that would let her continue to work remotely. ROI, pp. 491-496.

Ms. Bray denied that Complainant ever told her that she was being harassed or subjected to a hostile work environment, or that Ms. Bray's or anyone else's actions created a hostile work environment. She further denied that Complainant's medical condition or protected activity were factors in any of her actions. ROI, pp. 563-564.

Mr. Brown related that he was not aware of any hostile work environment and that management reached out to DRAD regarding Complainant's accommodation request. He acknowledged that Complainant claimed on March 8, 2023, that management was making decisions about her accommodation needs without Complainant's involvement but denied that Complainant ever told him that his or anyone else's actions created a hostile work environment. Mr. Brown related that he was unaware of such concerns being brought to the attention of any other management official. ROI, pp. 696-698.

A review of the record showed no evidence that Complainant alleged that she was subjected to harassment in the form of unwelcome verbal or physical conduct. As set forth above, Complainant has failed to show that her disability or protected EEO activity were the motivating factors for management's actions.

Complainant has not established that she was subjected to conduct which was either severe or pervasive. To prove a claim of illegal discriminatory harassment,

Complainant must establish that she was subjected to conduct that was either so severe or so pervasive that a "reasonable person" in Complainant's position would have found the conduct to be hostile or abusive. The antidiscrimination statutes are not civility codes. Rather, they forbid "only behavior so objectively offensive as to alter the conditions of the victim's employment." *Buster D. v. Dep't of State*, EEOC Appeal No. 2021004475 (Dec. 14, 2022), *citing Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998).

In this case, Complainant does not allege sufficient facts to show that her workplace was permeated with hostile or abusive verbal or physical conduct, based on her membership in a protected class, and we find no evidence in the record to support such a conclusion. For the foregoing reasons, we find that Complainant has failed to establish a *prima facie* case of harassment based on disability and/or prior protected EEO activity. Considering the totality of the circumstances and the evidence in the record, we determine that Complainant cannot show that she was subjected to hostile work environment harassment in a manner prohibited by Federal EEO law.

## **Decision**

Accordingly, we find that the Agency did not subject Complainant to disparate treatment discrimination, denial of a reasonable accommodation, or hostile work environment harassment based on disability and/or prior protected EEO activity as alleged.

## **Statement of Relief**

Complainant has not prevailed on this complaint of discrimination; therefore, no relief is awarded.

____________________________
Heather Olowski, Acting Director
Office of Civil Rights

Enclosure:
EEOC Appeal Form 573